*110 MARY Beth Kelly, J.
This case requires that we determine whether expert witness testimony regarding interrogation techniques and psychological factors claimed to generate false confessions is admissible under MRE 702 and MRE 403 and whether exclusion of this testimony violates the Sixth Amendment right to present a defense. The circuit court excluded the testimony of two experts regarding the occurrence of false confessions and the police interrogation techniques likely to generate them as well as the psychological characteristics of defendant that allegedly made him more susceptible to these techniques.
We hold that the circuit court did not abuse its discretion by excluding the expert testimony regarding the published literature on false confessions and police interrogations on the basis of its determination that the testimony was not reliable, even though the subject of the proposed testimony is beyond the common knowledge of the average juror. We also hold, however, that the circuit court abused its discretion by excluding the proffered testimony regarding defendant’s psychological characteristics because it failed to consider this evidence separately from the properly excluded general expert testimony and therefore failed to properly apply both MRE 702 and MRE 403 to that evidence. Accordingly, we remand this case to the circuit court for it to determine whether evidence of defendant’s psychological characteristics is sufficiently reliable for admissibility under MRE 702. We further hold that the circuit court’s application of MRE 702 did not violate defendant’s constitutional right to present a defense.
I. PACTS AND PROCEDURAL HISTORY
In May 2008, the brother and sister-in-law of defendant, Jerome Walter Kowalski, were found dead in their *111 home. Defendant was charged with both murders. Testimony elicited at defendant’s preliminary examination and Walker[1] hearing indicates that police questioned defendant about the killings four times over the course of several days: first at defendant’s home, next at the Brighton Police Station, then at the Ann Arbor Police Department, and finally at a Michigan State Police post.
During the third interview session, defendant acquiesced to the interviewer’s statement that there was a “fifty percent chance [he killed his brother], but a fifty percent chance [he] didn’t.” Defendant discussed having a “blackout” and “blurred” memory and stated, “I thought I had a dream Thursday, but it was the actual shooting.”
Defendant confessed to the murders during the last interview session, which followed a night in jail. Defendant stated that he went to his brother’s home, walked into the kitchen, and murdered his brother and sister-in-law after a brief verbal exchange. The record suggests that defendant initially described shooting his brother in the chest from a distance of several feet, although he eventually changed his account after a detective illustrated through role-playing that defendant’s first version of events did not corroborate the evidence recovered from the victims’ house. At this point in the pretrial proceedings, defendant’s confession is the primary evidence implicating him in the murders.
Before trial, defendant filed a motion to suppress his statements to the police, which the circuit court denied after conducting a Walker hearing. Defendant then filed a notice of intent to call two expert witnesses. Dr. Richard Leo, a social psychologist, would testify regard *112 ing police interrogation techniques and the existence of false confessions. Dr. Jeffrey Wendt, a clinical and forensic psychologist, proposed to testify about the psychological testing he performed on defendant and offer his opinion about defendant’s mental state during police questioning. Wendt would also offer testimony that the “circumstances of Mr. Kowalski’s confession were consistent with the literature on false confessions” and that the interaction between defendant and police “was consistent with a coerced internalized confession.”
The prosecutor moved to exclude this proposed expert testimony, arguing that it was inadmissible under MRE 702. Both experts testified at a Daubert[2] hearing. Leo explained that his research classified each confession he believed to be false as either a “proven false” confession, a “highly probable false” confession, or a “probable false” confession.[3] This categorization involved comparing the narrative of a defendant’s confession with other evidence, checking whether the confession led to independent evidence, and looking for other indicia of reliability, with a researcher determining *113 whether the confession fell into one of the three categories of false confessions.[4] While some of the facts involved in this analysis came “directly from case files,” many were gleaned from secondary sources, including popular media accounts.[5] In addition to classifying confessions by his confidence in their falsity, Leo also classified confessions as “voluntary false confessions,” “stress-compliant false confessions,” “coerced-compliant false confessions,” “coerced-persuaded false confessions,” or “non-coerced-persuaded false confessions.”[6] Leo categorized each confession in this manner by comparing the circumstances of each confession with those of other confessions he had already determined to be false.
*114 On the basis of this research, Leo proposed to testify that “false confessions are associated with certain police interrogation techniques,” that “some of those interrogation techniques were used in this case,” and that “risk factors associated with false and unreliable confessions, especially persuaded false confessions, were [also] present in this case.” In support of Leo’s opinions, defendant offered research conducted by Leo and by others. Some of this research appeared in peer-reviewed scientific journals, while some appeared in law reviews, which are not peer-reviewed.
Next, Wendt testified that he had administered a battery of standard psychological tests on defendant, performed an extensive clinical interview of defendant, and reviewed both the police reports recounting the circumstances of defendant’s police interrogation as well as the transcripts of those interrogations.[7] Wendt testified that these types of data are routinely used at the Center for Forensic Psychiatry.[8] Wendt then combined all these “data sources” to form a psychological profile, which allowed him to discuss how defendant’s traits affected his ability to interact with other people.[9] Lastly, Wendt proposed to testify that “[t]he circum *115 stances of [defendant’s] confession were consistent with the literature on false confessions” and that the interaction between defendant and the police “was consistent with a coerced internalized confession.”[10]
At the conclusion of the hearing, the circuit court excluded both experts’ proposed testimony. The circuit court ruled that Leo was qualified in terms of knowledge but that his testimony was unreliable and would not assist the trier of fact. The circuit court stated that “the lack of precise information” precluded Leo from measuring the accuracy of his studies and also critiqued the sources underlying Leo’s classifications of particular confessions as false:
[Leo] doesn’t. .. have the ability in his studies to review video tapes, which would be reliable. He relies on newspaper accounts, magazine articles. He relies on information provided from sources that are prejudice^], for example a defense attorney that represented a defendant, [and] advocates against the death penalty.... I don’t understand why he couldn’t have done a [Freedom of Information Act request], police agency files where confessions were given and the suspect was tried or not tried, pull court files, order transcripts, review police records.. .. [This] would be a ... more reliable methodology.
The circuit court examined the manner in which Leo analyzed the confessions that he determined to be false:
[Leo] starts with the conclusion that the confession is false and then he works backwards.... He doesn’t take into consideration why someone might falsely confess, other than because of a police interrogation technique.... [A]nd there are reasons why people would falsely confess, they might be trying to protect someone .... He hasn’t determined a reliable means to have a study group consist of innocent people who wrongfully confess that weren’t mentally ill or youth.
*116 The circuit court criticized this methodology for failing to compare true and false confessions and identify factors that contribute to false confessions but not true confessions. As the circuit court stated, “[I]f true and false confessions can be derived from the same police interrogation techniques, [how] is it possible to blame police interrogation techniques with any degree of reliability?” Given what the circuit court considered to be inadequacies of Leo’s data and methodology, the circuit court concluded that Leo’s testimony was unreliable.
The circuit court further determined that Leo’s testimony would not assist the trier of fact because the jury could evaluate the credibility and reliability of defendant’s confession in other ways:
The video tape will allow the jury to have a first hand view of exactly how the confession was elicited. The jurors will be able to view the police interrogation techniques used. The jury can determine credibility and determine whether the confession is reliable. They have a video. The jurors can figure out if it’s a persuaded confession by reviewing the tape and considering if the defendant was able to give facts to the police officer regarding the crime.
Accordingly, the circuit court ruled that Leo’s testimony failed to comply with MRE 702.
Finally, the circuit court concluded that Leo’s testimony was also properly excluded under MRE 403. The circuit court ruled that the “highly questionable” probative value of Leo’s testimony was outweighed by the danger of unfair prejudice because the jury would hear about confessions of defendants with characteristics not present in this case, such as mental illness and youth, and because Leo would describe some confessions as “proven false” when the data did not support that conclusion.
*117 With regard to Wendt’s testimony, the circuit court found that the exclusion of Leo’s testimony regarding the phenomenon of false confessions also required the exclusion of Wendt’s testimony:
With no other evidence about false confessions, I don’t see how this could be relevant, helpful or do anything other than be misleading. ... What does that do in this case, other than result in misleading evidence, irrelevant evidence, or at least, that probative value would be substantially outweighed by the danger of unfair prejudice.
Defendant sought interlocutory leave to appeal the circuit court’s decision excluding the expert testimony. The Court of Appeals stayed the circuit court proceedings, but ultimately affirmed the circuit court in a split decision.[11] The Court of Appeals majority agreed with the circuit court that Leo’s testimony would have been unhelpful because it “would not have involved a proposition that was outside the common knowledge of a layperson.”[12] The Court of Appeals concluded that the circuit court’s reliability determination was not an abuse of discretion, reasoning that Leo had used subjective determinations of which confessions were false, that his methodology could not be subjected to testing, and that no rate of error could be quantified.[13] The Court of Appeals also concluded that the circuit court did not abuse its discretion by determining that Wendt’s testimony would not have assisted the trier of fact. The Court of Appeals explained that this testimony related to witness credibility, which is within the sole province of the jury, and that Wendt could not distinguish the characteristics of a person who makes a false confession from the characteristics of a person who *118 makes a true confession.[14] The Court of Appeals agreed with the circuit court that the danger of unfair prejudice outweighed the probative value of the testimony of both witnesses and that their testimony was inadmissible under MRE 403, reasoning that an opinion on the truthfulness of defendant’s confession was implicit in the testimony.[15] Finally, the Court of Appeals rejected defendant’s claim that the circuit court had violated his constitutional right to present a defense, explaining that “this right is not absolute: the accused must still comply with established rules of procedure and evidence designed to assure both fairness and reliability in the ascertainment of guilt and innocence.”[16]
The Court of Appeals partial dissent would have reversed the circuit court’s decision with respect to Leo’s testimony regarding “the general fact of false confessions” and with respect to Wendt’s testimony to the extent it could stand independently of Leo’s.[17] The dissent discussed empirical evidence that jurors “were commonly skeptical of false confessions” and claimed that the majority made “assumptions ... as to what a layperson may or may not commonly know.”[18] The dissent also concluded that Wendt’s testimony “that defendant’s personality makes him more susceptible to influence than normal is based on reliable methodologies and is highly relevant to explain his mental state as a circumstance attendant to his confession.”[19]
Defendant applied for leave to appeal in this Court. We granted leave and instructed the parties to address
*119 (1) whether the defendant’s proffered expert testimony regarding the existence of false confessions, and the interrogation techniques and psychological factors that tend to generate false confessions, is admissible under MRE 702; (2) whether the probative value of the proffered expert testimony is substantially outweighed by the danger of unfair prejudice; and (3) whether the Livingston Circuit Court’s order excluding the defendant’s proffered expert testimony denies the defendant his constitutional right to present a defense.[20]
II. STANDARD OP REVIEW
This Court reviews for an abuse of discretion a circuit court’s decision to admit or exclude evidence.[21] An abuse of discretion results when a circuit court selects an outcome falling outside the range of principled outcomes.[22] We review de novo constitutional questions and issues of law underlying evidentiary rulings.[23]
III. ANALYSIS
A. MRE 702
MRE 702 establishes prerequisites for the admission of expert witness testimony.[24] The rule provides:
If the court determines that scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experi *120 ence, training, or education may testify thereto in the form of an opinion or otherwise if (1) the testimony is based on sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.
A court considering whether to admit expert testimony under MRE 702 acts as a gatekeeper and has a fundamental duty to ensure that the proffered expert testimony is both relevant and reliable.[25] The overarching goal is “to make certain that an expert... employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field.”[26] Because there are many different kinds of experts and expertise, this inquiry is, by necessity, a flexible one, and a court determining the admissibility of expert testimony may consider reliability factors pertinent to the particular type of expert testimony offered and its connection to the particular facts of the case.[27]
Whatever the pertinent factors may be, however, a court evaluating proposed expert testimony must ensure that the testimony (1) will assist the trier of fact to understand a fact in issue, (2) is provided by an expert qualified in the relevant field of knowledge, and (3) is based on reliable data, principles, and methodologies that are applied reliably to the facts of the case.[28] Although these considerations are separate and distinct and must each be satisfied independently, they are, in *121 fact, overlapping in nature. For example, “[a]n expert who lacks ‘knowledge’ in the field at issue cannot ‘assist the trier of fact.’ ”[29] Likewise, expert testimony without a credible foundation of scientific data, principles, and methodologies is unreliable and, thus, unhelpful to the trier of fact.[30] Indeed, proposed expert testimony must meet all the other requirements of MRE 702 in order to “assist the trier of fact to understand the evidence or to determine a fact in issue . . . .”
However, the threshold inquiry — whether the proposed expert testimony will “assist the trier of fact to understand the evidence or to determine a fact in issue” — is also not satisfied if the proffered testimony is not relevant or does not involve a matter that is beyond the common understanding of the average juror. Interpreting the nearly identical language in the federal counterpart to MRE 702,[31] the United States Supreme Court explained that helping the trier of fact to “understand the evidence or to determine a fact in issue” presents a question of relevance because “ ‘[e]xpert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful.’ ”[32] Similarly, if *122 the average juror does not need the aid of expert interpretation to understand a fact at issue, then the proffered testimony is not admissible because “it merely deals with a proposition that is not beyond the ken of common knowledge.”[33] These considerations of relevancy and the need for expertise are independent of the other requirements of MRE 702. Thus, even proposed expert testimony that is offered by a qualified expert and based on reliable scientific data and methods may be properly excluded if it is not relevant to the facts of the case or is offered for a proposition that does not require the aid of expert interpretation.
In this case, the Court of Appeals affirmed the circuit court’s exclusion of the expert testimony primarily because, in its view, the expert testimony about false confessions “would not have involved a proposition that was outside the common knowledge of a layperson.”[34] Thus, we first address whether testimony regarding the phenomenon of false confessions is beyond the factfinder’s “ken of common knowledge” before proceeding to the lower courts’ application of the additional requirements of MRE 702.
*123 B. FALSE-CONFESSION TESTIMONY AND THE “BEYOND COMMON KNOWLEDGE” REQUIREMENT
As we have explained, whether expert testimony is beyond the ken of common knowledge is a commonsense inquiry that focuses on whether the proposed expert testimony is on a matter that would be commonly understood by the average person.[35] If “the untrained layman would be qualified to determine intelligently and to the best possible degree the particular issue without enlightenment from those having a specialized understanding of the subject involved in the dispute,” then expert testimony is unnecessary.[36]
Although we have not considered whether the aid of expertise may help a juror to understand the occurrence of false confessions, we have allowed experts to explain other human behavior that is contrary to the average person’s commonsense assumptions. In People v Peterson, for example, we observed that victims of child sexual abuse sometimes exhibit behavior, such as delayed reporting of abuse or retraction of accusations, that psychologists understand to be common among abuse victims but that jurors might interpret as being inconsistent with abuse.[37] We held that if the victim’s *124 credibility is attacked by highlighting this behavior, then a qualified expert may explain the consistencies between the behavior of that victim and that of other victims of child sexual abuse. We further explained that such testimony was helpful to address “behavioral traits that may, by their very nature, create confusion in the minds of the jury.”[38]
Likewise, in People v Christel, we observed that expert testimony is needed when a “witnesses] actions or responses are incomprehensible to average people.”[39] Thus, we permitted a prosecution expert to testify about battered woman syndrome and how a victim of domestic violence might “deny, repress, or minimize the abuse . . . .”[40] We held that this type of testimony was “relevant and helpful when needed to explain a complainant’s actions . . . .”[41]
The common theme in these cases is that certain groups of people are known to exhibit types of behavior that are contrary to common sense and are not within the average person’s understanding of human behavior. In these instances, an expert’s specialized testimony may enlighten the jury so that it can intelligently evaluate an experience that is otherwise foreign.
Although we have not recognized that making a purported false confession constitutes behavior contrary .to common sense, the Court of Appeals did so in People v Hamilton.[42] In that case, the defendant was *125 charged with felony-murder and other crimes based solely on a confession he had made to the police. The defense theory was that the defendant had not committed the crimes and had falsely confessed. In support, the defendant proffered testimony of a clinical psychologist who would have testified “how defendant’s psychological makeup might have affected his statements to the police.”[43] The Court of Appeals, citing Crane v Kentucky,[44] recognized that a rational juror does not readily understand why a defendant who is innocent might confess to a crime and that expert testimony regarding a defendant’s psychological makeup might be relevant to a confession’s reliability and credibility. The Court of Appeals, therefore, reversed the lower court’s exclusion of the evidence, explaining:
[E]vidence of the manner in which a confession was obtained may be highly relevant to the confession’s reliability and credibility....
[The proffered testimony] would help the jury understand the circumstances surrounding defendant’s statements to the police and how those circumstances affected the reliability and credibility of defendant’s statements. *126 Such an understanding is central to the jury’s determination of defendant’s guilt or innocence.[45]
We agree with Hamilton that expert testimony bearing on the manner in which a confession is obtained and how a defendant’s psychological makeup may have affected the defendant’s statements is beyond the understanding of the average juror and may be relevant to the reliability and credibility of a confession.[46]
In the instant case, however, the Court of Appeals, like the circuit court, held that the proffered testimony about false confessions “would not have involved a proposition that was outside the common knowledge of a layperson”[47] because the jury could perform its own analysis of defendant’s inculpatory statements. Certainly, we have no disagreement with the premise that issues involving credibility and the weight of the evidence are within the province of the jury. However, the Court of Appeals’ analysis wrongly focused on the jury’s role, which is not part of the MRE 702 analysis, rather than on what knowledge the common person possesses and whether the aid of specialized knowledge can help a juror understand a fact at issue. Like the behavior of the child sexual abuse and domestic violence victims in Peterson and Christel, a purported false confession of *127 the sort in Hamilton constitutes counterintuitive behavior that is not within the ordinary person’s common understanding, and thus expert assistance can help jurors understand how and why a defendant might confess falsely.[48] The exclusion of such expert testimony when it meets all the requirements of our evidentiary rules could, in some instances, hinder the jury in its task because without the enlightenment of expert opinion the jury’s ultimate determination may not be arrived at intelligently.
Our conclusion that a confession challenged as false constitutes behavior contrary to common sense finds additional support in a longstanding presumption deeply rooted in our country’s legal system: A person does not ordinarily make untruthful incriminating statements. As the United States Supreme Court explained more than 100 years ago, confessions are given great weight on the basis of the presumption that “one who is innocent will not imperil his safety or prejudice his interests by an untrue statement. . . ,”[49] Our “state *128 ment against interest” exception to the hearsay rule embodies this presumption and allows the admission of hearsay statements, which are typically considered untrustworthy, if the statement tended to subject the declarant to criminal liability, so “that a reasonable person .. . would not have made the statement unless believing it to be true.”[50] The premise underlying this hearsay exception is “the common-sense intuition that a reasonable person would be expected to lie, if at all, only in his own favor, and would not harm himself by his own words.”[51] Despite this well-established, commonsense presumption, embodied in our evidentiary rules, that a person does not make false incriminating statements, both the Court of Appeals and the circuit court simply presumed that the average juror possessed the knowledge to evaluate factors that might lead to a *129 false confession. This conclusion is not grounded in the necessary commonsense inquiry and lacks any legal basis.
Accordingly, we hold that because the claim of a false confession is beyond the common knowledge of the ordinary person, expert testimony about this phenomenon is admissible under MRE 702 when it meets the other requirements of MRE 702. We caution, however, that like other expert testimony explaining counterintuitive behavior, the admissibility of expert testimony pertaining to false confessions is not without limitations. An expert explaining the situational or psychological factors that might lead to a false confession may not “comment on the . . . truthfulness” of a defendant’s confession,[52] “vouch for the veracity” of a defendant recanting a confession,[53] or “give an opinion as to whether defendant was telling the truth when he made the statements to the police.”[54] These conventional limitations are necessary to guard against the potential for jurors to view the expert “not only as possessing specialized knowledge in terms of behavioral characteristics generally associated with the class of” defendants subject to police interrogation, but also as “possessing] some specialized knowledge for discerning the truth.”[55] Given the availability of these conventional limitations, we — unlike the Court of Appeals, which viewed the expert testimony as tantamount to testimony that defendant’s confession was false — are less pessimistic *130 about the circuit court’s management of the proposed testimony and the jury’s capability to properly evaluate and assess the testimony in light of all the evidence submitted at trial.[56]
In this case, the proposed testimony of both experts regarding the phenomenon of false confessions and Wendt’s testimony regarding defendant’s psychological characteristics would explain a proposition that is beyond the ken of common knowledge. Thus, the lower courts erred to the extent that they excluded the evidence solely on the basis that it “merely deals with a proposition that is not beyond the ken of common knowledge.”[57]
*131 C. ADDITIONAL REQUIREMENTS OP MRE 702
Our conclusion in this regard does not end our analysis. We must still consider the other requirements of MRE 702 before determining whether the circuit court’s ultimate conclusion to exclude the proposed testimony amounted to an abuse of discretion. As we have explained, the testimony of Leo and Wendt is admissible under MRE 702 if it meets the other requirements of the evidentiary rule: the “witness [is] qualified as an expert by knowledge, skill, experience, training, or education,” the “testimony is based on sufficient facts or data,” the “testimony is the product of reliable principles and methods,” and the “witness has applied the principles and methods reliably to the facts of the case.”[58] When evaluating the reliability of a scientific theory or technique, courts consider certain factors, including but not limited to whether the theory has been or can be tested, whether it has been published and peer-reviewed, its level of general acceptance, and its rate of error if known.[59] This analysis requires courts to ensure that “each aspect of an expert witness’s proffered testimony — including the data underlying the expert’s theories and the methodology by which the expert draws conclusions from that data — is reliable.”[60]
Here, the expert testimony consists of two distinct categories: testimony by Leo and Wendt regarding the general phenomenon of false confessions and testimony *132 by Wendt regarding his clinical psychological examination of defendant. We address each category in turn as it relates to the remaining requirements of MRE 702.
1. GENERAL TESTIMONY ABOUT FALSE CONFESSIONS
Both Leo and Wendt proposed to offer testimony based on research and literature about the phenomenon of false confessions. Leo proposed to testify that false confessions existed, that certain psychological interrogation techniques commonly employed by the police sometimes resulted in false confessions, and that some of those techniques were used in this case. Wendt proposed to build on this foundation and testify that “[t]he circumstances of [defendant’s] confession were consistent with the literature on false confessions” and that the interaction between defendant and the police “was consistent with a coerced internalized confession.”
With regard to Leo, the circuit court followed the mandate of MRE 702 and carefully reviewed all the stages of Leo’s research, starting with his data.[61] The circuit court noted that Leo decided whether a confession was false on the basis of information he gathered from sources such as newspaper accounts and attorneys representing the confessors. The circuit court questioned the accuracy and potential bias of these sources and even offered an alternative method of obtaining more authoritative documentation through Freedom of Information Act requests.
Next, the circuit court identified multiple problems with the analysis Leo applied to his data. Among the circuit court’s observations was that Leo “starts with the conclusion that the confession is false and then he *133 works backwards” to find commonalities. The circuit court concluded that, rather than yielding factors common to all false confessions, Leo’s method seemed to yield only factors common to confessions Leo believed to be false. This also made it impossible to test Leo’s research or compute its rate of error. The circuit court also noted that because Leo did not have a “reliable means to have a study group” that excluded extraneous factors, he had “no ability to estimate the frequency of false confessions.” The circuit court found troubling the number of confessions in Leo’s studies that involved factors not present in this case, such as a defendant’s youth or mental incapacity. Finally, the circuit court was troubled by a lack of “a random sample of confessions, true and false.”
Nothing in the circuit court’s analysis placed the exclusion of Leo’s testimony outside the range of principled outcomes.[62] The circuit court properly considered all stages of Leo’s analysis and found it unreliable at every stage. With regard to the data underlying Leo’s testimony, the circuit court reasonably determined that its sources were unreliable because they were prone to inaccuracy or bias and, in nearly all instances, had not been subjected to the rigorous standards of scientific peer-review. Additionally, the circuit court raised multiple legitimate concerns about the “manner in which [Leo] interpreted] and extrapolate[d] from those data.” The unreliable methodology, as the circuit court described, resulted in conclusions consistent with Leo’s own preconceived beliefs rather than testable results consistent with an objective, scientific process. Therefore, because the exclusion of Leo’s testimony was a reasonable and principled outcome, the circuit court’s decision did not amount to an abuse of discretion. The *134 Court of Appeals came to the same conclusion after making similar observations about the data and methods underlying Leo’s studies, and we thus affirm the lower courts’ decisions to exclude Leo’s testimony.[63]
Further, because the circuit court and Court of Appeals properly excluded Leo’s testimony pertaining to the literature of false confessions, they were also correct to exclude the portion of Wendt’s testimony indicating that defendant’s confession was consistent with this literature.[64] This part of Wendt’s testimony obviously relied on the same unreliable foundation that we have rejected with respect to Leo’s testimony. Thus, we cannot conclude that the lower courts committed an abuse of discretion by excluding this portion of Wendt’s testimony and we affirm their decisions to exclude it.
Our decision to uphold the exclusion of the testimony based on false-confession literature is supported by Vent v State,[65] in which the Alaska Court of Appeals also upheld the exclusion of testimony by Leo that was very similar to the testimony he offered in the instant case. Like the circuit court here, the Vent court was “troubled by the fact that there was no way to quantify or test Dr. Leo’s conclusions that certain techniques might lead to false confessions.”[66] The Vent court explained that while some courts allow testimony of this sort, many have held that it is not an abuse of discretion to exclude it.[67] *135 Ultimately, the Vent court concluded that there was “merit to [the Alaska superior court’s] questions concerning Dr. Leo’s methodology. . . .”[68] We have reached the same conclusion with regard to both experts’ testimony relating to the literature of false confessions.[69] However, this conclusion does not end our inquiry because Wendt’s testimony also encompassed a second category: evidence of his psychological testing of defendant.
2. PSYCHOLOGICAL-TESTING EVIDENCE
Wendt also proposed to testify regarding defendant’s psychological profile, which he constructed from psychological tests and clinical interviews of defendant. The circuit court excluded the entirety of Wendt’s testimony, reasoning that, without the evidence about false confession literature, his testimony on this subject would not assist the trier of fact. This conclusion was based on the erroneous premise that this portion of Wendt’s testimony was somehow dependent on false-confession research for its reliability. The record establishes, however, that this portion of Wendt’s testimony is, in fact, independent of the false-confession literature and was offered to illustrate a separate, but related, point regarding Wendt’s specific study of defendant *136 himself.[70] Wendt testified at length about the data he had gathered from an array of psychological tests he performed on defendant, his clinical interviews of defendant, and his review of the transcripts of defendant’s interrogation. Wendt also explained the methods he applied to this data, how he compiled a psychological profile, and what opinions he formed from this analysis.
This is exactly the type of expert testimony regarding defendant’s psychological profile that may “assist the trier of fact” within the meaning of MRE 702. Consequently, the circuit court abused its discretion by excluding this testimony on the basis of the absence of testimony about the false-confession literature. Because the circuit court did not apply the remaining MRE 702 factors to this second aspect of Wendt’s testimony, we do not hold that the circuit court is required to admit Wendt’s testimony, only that its basis for excluding Wendt’s testimony amounted to an abuse of discretion. On remand, it remains the circuit court’s duty to fulfill its gatekeeper role under MRE 702 with respect to any proposed expert testimony.[71]
Further, although the circuit court did not complete its analysis under MRE 702, it also opined that Wendt’s testimony was properly excluded under MRE 403. We conclude that the circuit court’s analysis of MRE 403 was similarly faulty. MRE 403 excludes relevant evidence only if “its probative value is substantially out *137 weighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury. . . .”[72] Evidence is unfairly prejudicial when “there exists a danger that marginally probative evidence will be given undue or preemptive weight by the jury.”[73] In this case, the circuit court reasoned, “With no other evidence about false confessions, I don’t see how this could be relevant, helpful or do anything other than be misleading,” and concluded that its “probative value would be substantially outweighed by the danger of unfair prejudice.” Thus, the circuit court ruled that Wendt’s testimony had no probative value in the absence of the testimony about false-confession literature.[74] We have explained that testimony like that Wendt proposed to offer can provide guidance to a fact-finder regarding behavior that would seem counterintuitive to a juror. Accordingly, and if the proposed testimony otherwise meets the requirements of MRE 702, the circuit court must consider this benefit in assessing the probative value of *138 the testimony. Because it failed to weigh Wendt’s testimony on the probative side of the analysis, the circuit court abused its discretion by excluding the evidence under MRE 403.
Again, we do not hold that the circuit court is required to admit this portion of Wendt’s testimony, just that it misapplied MRE 403 in excluding the testimony. However, in applying MRE 403 on remand, the circuit court must also consider whether the limits that this Court imposes on expert testimony of this nature and the possibility of a limiting jury instruction reduce the danger of any unfair prejudice.[75]
Accordingly, we reverse the portions of the Court of Appeals’ judgment and the circuit court order excluding the expert testimony regarding Wendt’s psychological testing of defendant. On remand, the circuit court must consider whether this testimony meets the requirements of MRE 702 and MRE 403.
D. RIGHT TO PRESENT A DEFENSE
Finally, defendant claims that, to the extent any of the proposed expert testimony is excluded, the exclusion violates his right to present a defense. Criminal *139 defendants have a constitutional right to “a meaningful opportunity to present a complete defense.”[76] The Sixth Amendment of the United States Constitution provides that a criminal defendant has the right “to have compulsory process for obtaining witnesses in his favor.” This right has been incorporated to the states through the Fourteenth Amendment.[77] The Supreme Court of the United States has held: “The right to offer the testimony of witnesses, and to compel their attendance, if necessary, is in plain terms the right to present a defense . . . ,”[78]
The right to present a defense limits the otherwise broad latitude of states to establish rules that exclude evidence from criminal trials.[79] When rules “infring[e] upon a weighty interest of the accused” and are “arbitrary” or “disproportionate to the purposes they are designed to serve,” they must yield to the constitutional right.[80] However, while the right to present a defense is a fundamental part of due process, “it is not an absolute right,” and “[t]he accused must still comply with ‘established rules of procedure and evidence designed to assure both fairness and reliability in the ascertainment of guilt and innocence.’ ”[81]
We must therefore determine whether the exclusion of the expert testimony at issue denies defendant his constitutional right to present a defense. To do so, we *140 consider the purpose MRE 702 is designed to serve. The purpose of nearly identical FRE 702 is to “ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable.”[82] In discussing FRE 702, the United States Supreme Court has explained that the inquiry is a “flexible one” and that “ [i]ts overarching subject is the scientific validity” of the proposed testimony.[83] The same can be said of MRE 702.[84] Ultimately, courts are vested with the gatekeeping authority to apply MRE 702 on a case-by-case basis.[85]
The lack of such discretion is what has most often prompted the United States Supreme Court to strike down evidentiary rules as violative of the Sixth Amendment. In Rock v Arkansas, for example, the Court considered a categorical rule prohibiting the consideration of a hypnotically refreshed memory.[86] The Court struck down the rule because it “leaves a trial judge no discretion to admit this testimony, even if the judge is persuaded of its reliability by testimony at a pretrial hearing.”[87] In contrast, every proper application of MRE 702 requires a careful consideration of the reliability of the proffered evidence. The very act of conducting a Daubert hearing establishes that a circuit court’s gatekeeping role under MRE 702 is neither “arbitrary” nor “disproportionate to the ends [it is] asserted to promote” because “the Constitution permits *141 judges to exclude evidence that is .. . only marginally relevant or poses an undue risk of harassment, prejudice, [or] confusion of the issues”[88] and evidence that fails to meet the requirements of MRE 702 will always be only marginally relevant or risk confusing the trier of fact.[89] Consequently, we hold the proper application of MRE 702 in this case to exclude Dr. Leo’s testimony and the portion of Dr. Wendt’s testimony that would rely on false confession research does not deny defendant his constitutional right to present a defense.
IV RESPONSE TO THE DISSENT
The dissenting justice’s principal disagreement with our decision stems from our view that the phenomenon of false confessions is beyond the average person’s common knowledge. The dissent, however, does not dispute that the “statement against interest” exception to the hearsay rule embodies the presumption that a person does not ordinarily make untruthful incriminating statements, which is a strong indicator that the circumstances of a false confession are beyond the average person’s understanding. Still, the dissent dismisses the significance of the fact that this presumption *142 is embodied in our rules of evidence as well as the significance of our caselaw recognizing that the aid of expertise can help jurors understand similarly counter-intuitive behavior.[90] The dissent also does not dispute that our caselaw indeed permits expert testimony to explain counterintuitive behavior. Instead, the dissent insists that the average person is capable of understanding why a person might falsely confess to a crime and under what circumstances. This argument is unconvincing in part because it relies not on any established legal principles of our jurisprudence but, for the most part, on a law review article authored by a law student and on the concededly unreliable testimony of Leo.
Having posited that jurors can, in fact, understand without the aid of expertise why a person might falsely confess, the dissent supports this view with a list of our holding’s supposed ill effects. But the dissent’s fears that our decision will cause jurors to subordinate their judgment to the “false appearance of expertise,”[91] “open up the floodgates for expert testimony,”[92] and turn criminal trials into “battles of psychological experts”[93] are simply unfounded. Our holding is limited to the principle that a claim of a false confession is beyond the common knowledge of the ordinary person and that expert testimony regarding this phenomenon is admissible under MRE 702 only if it meets the other requirements of MRE 702. Thus, far from the dissent’s interpretation of our decision, we have not created a rule *143 allowing the admission of faux expert testimony regarding false confessions. Rather, a defendant proffering expert testimony on the phenomenon of false confessions must meet all the requirements not only of MRE 702, but also of MRE 403 before the testimony could be admitted. Thus, the ramifications the dissent fears — the “routine” use of experts by both the defense and the prosecution, and prolonged and more costly proceedings — are exaggerated. And while there may be some lengthening of the trial process in those few cases in which expert testimony regarding false confessions is admitted, the result is not “gamesmanship” “for no good reason,” but an aid in the furtherance of a criminal trial’s “principal mission, the search for the truth.”[94]
Further, the dissent lists several types of behavior that it believes could be subject to expert testimony as a result of our decision. However, that concern is not supported by today’s holding. We agree with the dissent that questions of eyewitness identification, fading memories, witnesses’ body language, and the like involve obvious human behavior from which jurors can make “commonsense credibility determinations.”[95] None of this behavior is recognized in our law as having special indicia of reliability. A statement against penal interest, on the other hand, is presupposed to be trustworthy and credible, which is precisely why an alleged false confession is a counterintuitive behavior that may, like other counterintuitive behavior recognized by our caselaw, require the aid of expertise to explain. The legal principles that are the foundation of our holding do not also support the need for expert testimony to explain the common human behavior described by the dissent.
*144 v CONCLUSION
We affirm the exclusion of Leo’s testimony and the portion of Wendt’s testimony based on false-confession research because the circuit court’s determination that it was not reliable under MRE 702 was not an abuse of discretion and its exclusion does not violate defendant’s right to present a defense. Because the circuit court and the Court of Appeals erred by excluding Wendt’s testimony regarding the psychological testing he performed on the ground that it depended on the testimony of Leo, we reverse those rulings and remand this case to the circuit court for the court to determine its admissibility under MRE 702 and MRE 403.
YOUNG, C.J., and ZAHRA, J., concurred with MARY BETH Kelly, J.

 People v Walker (On Rehearing), 374 Mich 331; 132 NW2d 87 (1965).

 Daubert v Merrell Dow Pharm, Inc, 509 US 579; 113 S Ct 2786; 125 L Ed 2d 469 (1993).

 Leo’s research classifies a confession as “proven false” if “it can be objectively established that the suspect confessed to a crime that did not happen,” that “the defendant could not have committed the crime,” that “the true perpetrator of a crime is identified and his guilt can be objectively established,” or that “scientific evidence — in recent years, most commonly DNA evidence — dispositively establishes the false confessor’s innocence.” Drizin & Leo, The problem of false confessions in the post-DNA world, 82 NC L R 891, 925-926 (2004). Confessions are classified as “highly probable false” if the researchers are satisfied that the confessor’s innocence was established “beyond a reasonable doubt” and “probable false” if the researchers are satisfied the confessor’s innocence was established only by a “preponderance of the evidence.” Leo & Ofshe, The consequences of false confessions: Deprivations of liberty and miscarriages of justice in the age of psychological interrogation, 88 J Crim L & Criminology 429, 436-437 (1998).

 Id. at 438-440.

 See id. at 456 n 199, 457 n 203, 459 n 225, and 461 n 243, citing Eye To Eye with Connie Chung: Confession (CBS News Television Broadcast, January 13, 1994); Page Free After Doing 2½ Years for 1984 Killing of His Girlfriend, SF Examiner, February 11, 1995, p A5; Carolyn Colwell, Tankleff’s Family: Jury Goofed Relatives Say “Poker Face” Hurt Teen in Murder Trial, Newsday, July 3, 1990, p 6; 60 Minutes: Richard Lapointe: Did He Do It? (CBS News Television Broadcast, June 30, 1996).

 Leo’s research classifies a confession as a “voluntary false confession” when offered “either without police interrogation or in response to minimal police pressure.” Leo, False Confessions: Causes, Consequences, and Solutions, in Westervelt & Humphrey, eds, Wrongly Convicted: Perspectives on Failed Justice (New Jersey: Rutgers University Press, 2001), ch 2, p 42. Confessions are classified as “stress-compliant false confessions” when “the stresses and pressures of custodial questioning overwhelm the suspect and she comes to believe that the only way to terminate the punishing experience of interrogation is by confessing.” Id. Confessions are classified as “coerced-compliant false confessions” when “ ‘a suspect confesses in order to escape or avoid an aversive interrogation or to gain a promised reward.’ ” Id. at 43 (citation omitted). Confessions are classified as “coerced-persuaded false confessions” when “the interrogator’s use of coercive influence techniques causes [the confessor] to temporarily doubt the reliability of his memoiy; believe that he probably did, or logically must have, committed the crime under question; and confess to it, despite having no memoiy or knowledge of participating in or committing the offense. Id. “Non-coerced-persuaded false confessions” are similar to coerced-persuaded false confessions but “[are] not elicited in response to coercive interrogation techniques.” Id. at 44.

 The battery of tests included the Personality Assessment Inventory, the Minnesota Multiphasic Personality Inventory, and the Substance Abuse Subtle Screening Inventory.

 The Center for Porensic Psychiatry, located outside Ann Arbor, hosts Michigan’s only certified forensic facility and conducts all competency and criminal responsibility evaluations ordered in Michigan criminal proceedings.

 Specifically, Wendt stated that defendant’s
lack of interpersonal strength or drive leaves him vulnerable to being influenced by others. . .. The combination of his, of his cognitive factors in terms of his anxiety and depression; his interpersonal factors, in terms of his, low assertiveness, leave him particularly vulnerable to suggestion by others and influence by others, particularly people who are in positions of authority.

 The literature uses the terms “coerced internalized confession” and “coerced-persuaded false confession” interchangeably.

 People v Kowalski, unpublished opinion per curiam of the Court of Appeals, issued August 26, 2010 (Docket No. 294054).

 Id. at 3.

 Id. at 4.

 Id. at 5.

 Id.

 Id. at 3 (quotation marks and citations omitted).

 Id. at 1-2 (Davis, J., concurring in part and dissenting in part).

 Id. at 2.

 Id. at 1.

 People v Kowalski, 489 Mich 858 (2011).

 Edry v Adelman, 486 Mich 634, 639; 786 NW2d 567 (2010).

 People v Babcock, 469 Mich 247, 269; 666 NW2d 231 (2003).

 Dep’t of Transp v Haggerty Corridor Partners Ltd Partnership, 473 Mich 124, 134; 700 NW2d 380 (2005); People v McCuller, 479 Mich 672, 681; 739 NW2d 563 (2007).

 Gilbert v DaimlerChrysler Corp, 470 Mich 749, 782, 789; 685 NW2d 391 (2004).

 Daubert, 509 US at 589.

 Kumho Tire Co, Ltd v Carmichael, 526 US 137, 152; 119 S Ct 1167; 143 L Ed 2d 238 (1999).

 Daubert, 509 US at 594-595; Kumho Tire Co, 526 US at 149-151 (explaining that a court has considerable leeway in how to decide whether expert testimony is reliable in a particular case depending on the nature of the issue, the expert’s expertise, and the subject of the testimony).

 MRE 702.

 Gilbert, 470 Mich at 789.

 Id. at 790, quoting Zuzula v ABB Power T & D Co, Inc, 267 F Supp 2d 703, 711 (ED Mich, 2003).

 FRE 702 stated before its amendment, effective December 1, 2011:
If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

 Daubert, 509 US at 591, quoting 3 Weinstein & Burger, Weinstein’s Evidence, ¶ 702[02], p 702-18. As applied in this case, this threshold determination of relevance has been met, since defendant claims that his *122 confession, the primary evidence tying him to the murders, was a false confession of the type that Leo and Wendt study.

 Gilbert, 470 Mich at 790, quoting Zuzula, 267 F Supp 2d at 711. The original Note of the Advisory Committee to FRE 702 recognizes this same principle:
“There is no more certain test for determining when experts may be used than the common sense inquiry whether the untrained layman would be qualified to determine intelligently and to the best possible degree the particular issue without enlightenment from those having a specialized understanding of the subject involved in the dispute.” Ladd, Expert Testimony, 5 Vand.L.Rev. 414, 418 (1952). When opinions axe excluded, it is because they are unhelpful and therefore superfluous and a waste of time. 7 Wigmore[, Evidence] § 1918.

 Kowalski, unpub op at 3.

 See, e.g., Berry v Detroit, 25 F3d 1342, 1350 (CA 6, 1994) (“If everyone knows [the proposition the expert would testify to], then we do not need an expert because the testimony will not ‘assist the trier of fact to understand the evidence or to determine a fact in issue . .. ”), quoting former FRE 702.

 See Note to former FRE 702 as quoted in note 33 of this opinion; see also Kumho Tire, 526 US at 149 (noting that expert testimony rests “ ‘upon an experience confessedly foreign in kind to [the jury’s] own’ ”), quoting Hand, Historical and practical considerations regarding expert testimony, 15 Harv L R 40, 54 (1901). As Judge Learned Hand explained, “The whole object of the expert is to tell the jury... general truths derived from his specialized experience.... It is just because [the jurors] are incompetent for such a task that the expert is necessary at all.” Hand, 15 Harv L R at 54.

 People v Peterson, 450 Mich 349, 363; 537 NW2d 857 (1995).

 Id. at 375.

 People v Christel, 449 Mich 578, 592; 537 NW2d 194 (1995).

 Id. at 585.

 Id. at 580.

 People v Hamilton, 163 Mich App 661; 415 NW2d 653 (1987). Multiple federal circuits have acknowledged, at least implicitly, that the average person does not understand why a defendant would make false inculpatory statements and have permitted the admission of expert *125 testimony bearing on factors that could lead to a false confession. See United States v Roark, 753 F2d 991, 994-995 (CA 11, 1985) (holding admissible under FRE 702 “testimony... designed to help the trier of fact determine whether it was more or less probable that [the defendant] was somehow psychologically coerced into [confessing]”); United States v Shay, 57 F3d 126, 134 (CA 1, 1995) (holding that the district court erred by excluding expert testimony pertaining to the defendant’s “mental disorder that caused him to make false statements” because such testimony is contrary to the commonsense assumption that individuals do not falsely confess).

 Hamilton, 163 Mich App at 663.

 Crane v Kentucky, 476 US 683, 688-690; 106 S Ct 2142; 90 L Ed 2d 636 (1986).

 Hamilton, 163 Mich App at 666-667.

 The circuit court and Court of Appeals, like the dissent, distinguished Hamilton, in part, on the ground that it was decided before MRE 702 incorporated the Daubert standards. The Court of Appeals reasoned that under earlier MRE 702 analysis, “the trial court was not required to make a ‘searching inquiry’ into the reliability of the proffered expert’s testimony by analyzing the expert’s methodologies and principles.” Kowalski, unpub op at 6. However, Hamilton’s reasoning regarding whether expert testimony was beyond the average person’s common knowledge was unchanged by Daubert and is still instructive on that point. We address the issue of reliability separately.

 Kowalski, unpub op at 3.

 The dissent attempts to diminish the significance of Peterson and Christel by suggesting that they do not support our holding, in part because they were decided before the amendment of MRE 702 to conform to Daubert. The amendment, however, is irrelevant because it did not affect the inquiry whether expert testimony is beyond the average person’s common knowledge. The dissent further attempts to distinguish Peterson and Christel on the basis that the phenomenon of a false confession is a “commonplace circumstance!]” that jurors are well equipped to understand, unlike “the extraordinary relationships of the sexually abused child and the battered woman ...Post at 164-165. However, this assertion unreasonably assumes that the ordinary juror has the “life’s experience to comprehend,” post at 164-165, the circumstances of police interrogation — circumstances typically experienced only by those accused of criminal conduct — and the effect of a defendant’s particular psychological traits on the outcome of the interrogation. The distinctions drawn by the dissent are therefore unavailing.

 Hopt v People of the Territory of Utah, 110 US 574, 585; 4 S Ct 202; 28 L Ed 262 (1884); see also Crane, 476 US at 689 (recognizing that *128 rational jurors attach credibility to a defendant’s confession because an innocent defendant would not admit guilt).

 MRE 804(b)(3). This presumption is also embodied in the rules of evidence in many other states. See Alas R Evid 804(b)(3); Ariz R Evid 804(b)(3); Ark R Evid 804(b)(3); Cal Evid Code § 1230; Del R Evid 804(b)(3); Fla Stat 90.804(2)(c); Ga Code Ann 24-8-804(b)(3) (effective until January 1, 2013); Hawaii R Evid 804(b)(3); Idaho R Evid 804(b)(3); Iowa R Evid 5.804(b)(3); La Code Evid 804 (B)(3); Minn R Evid 804(b)(3); Miss R Evid 804(b)(3); Mont R Evid 804(b)(3); Neb Rev Stat 27-804(2)(c); Nev Rev Stat 51.345; NH R Evid 804(b)(3); NJ R Evid 803(c)(25); Okla Stat tit 12, § 2804(B)(3); Or Rev Stat 40.465(3)(c); RI R Evid 804(b)(3); SC R Evid 804(b)(3); SD Codified Laws 19-16-32; Tenn R Evid 804(b)(3); Vt R Evid 804(b)(3); W Va R Evid 804(b)(3); Wis Stat 908.045(4); Wyo R Evid 804(b)(3); see also People v Ennis, 11 NY3d 403, 413; 872 NYS2d 364; 900 NE2d 915 (2008) (“To qualify under [the declarations against penal interest exception to the hearsay rule], the declarant must be unavailable, must have competent knowledge of the facts and must have known at the time the statement was made that it was against his or her penal interests . . . .”); State v Zerban, 412 SW2d 397, 399-400 (Mo, 1967) (“[I]f he made any incriminating statements, untrue denials evincing a consciousness of guilt, they would constitute admissions against interest and be admissible in evidence.”).

 People v Watkins, 438 Mich 627, 636; 475 NW2d 727 (1991).

 See Christel, 449 Mich at 580.

 See Peterson, 450 Mich at 352.

 See Hamilton, 163 Mich App at 669.

 People v Beckley, 434 Mich 691, 727-728; 456 NW2d 391 (1990) (opinion by Brickley, J.). Additionally, and should the parties request it, a circuit court may provide, as an added safeguard against this potential danger, a limiting instruction directing the jury to consider the testimony only for its intended and limited purpose.

 The Court of Appeals concluded that an unavoidable inference would be drawn from the expert testimony that defendant falsely confessed or that the testimony would, at least, “directly [imply] that the police influenced [defendant] into making a false confession.” Kowalski, unpub op at 6. The possibility that the jury might draw a particular conclusion from the expert testimony, or that a party might argue that a particular conclusion should be drawn from that testimony, does not mean that the expert himself is implying what conclusion should be drawn. Otherwise, we would have excluded the proposed expert testimony in Peterson and Christel on the grounds that the testimony itself would imply that the victims had, in fact, been abused. We rejected this argument in Peterson and Christel and we reject it again here.
The dissent also dismisses these safeguards as ineffective, claiming that an expert on false confessions is akin to a “human lie detector” whose testimony will almost certainly cause jurors to casually abandon their role of assessing witness credibility. Post at 160 (quotation marks and citation omitted). This analogy is inapt because the “aura of infaUibiliiy” surrounding polygraph evidence — which is derived from a physiological test to determine whether a person is lying — is not attendant to experts testifying about the phenomenon of false confessions and defendants’ psychological traits. Post at 160 (quotation marks and citation omitted). Further, we assume that “jurors are presumed to follow their instructions,” People v Graves, 458 Mich 476, 486; 581 NW2d 229 (1998), and we must consider the extent to which a juror has the ability both to follow those instructions and to autonomously assess the credibility of the expert’s testimony in light of all the other evidence produced at trial.

 Gilbert, 470 Mich at 790.

 MRE 702.

 Daubert, 509 US at 593-594. These factors are typically referred to as the “Daubert factors,” but, as explained in note 27 of this opinion and the accompanying text, a court has great leeway to consider additional, or other, factors pertinent to the particular area of expertise. All the Daubert factors are pertinent in this case because, as in Daubert, the expert testimony pertains to scientific theories and techniques.

 Gilbert, 470 Mich at 779.

 The parties do not dispute the circuit court’s ruling that Leo is qualified as an expert in this field.

 Babcock, 469 Mich at 269.

 The dissent would also exclude Leo’s testimony under MRE 403. Because we have concluded that the circuit court did not abuse its discretion by excluding Leo’s testimony under MRE 702, we need not examine whether MRE 403 also allows for the testimony’s exclusion.

 The parties do not dispute that Wendt is qualified as an expert.

 Vent v State, 67 P3d 661, 667-670 (Alas App, 2003).

 Id. at 669.

 See, e.g., Edmonds v State, 955 So 2d 787 (Miss, 2007) (affirming the circuit court’s decision excluding an expert’s false confession testimony); Green v State, 55 SW3d 633, 640 (Tex App, 2001) (affirming the trial *135 court’s decision excluding an expert’s false confession testimony); United States v Griffin, 50 MJ 278, 284 (CA AF, 1999) (holding that the testimony of a defense expert on false confessions was properly excluded as not sufficiently reliable); Kolb v State, 930 P2d 1238 (Wy, 1996) (affirming the exclusion of expert false confession testimony).

 Vent, 67 P3d at 670.

 Our decision in this regard does not deprive defendant of his theory of the case: that he falsely confessed. Defendant may cross-examine the police officers about.their training regarding interrogation techniques and the methods they used in this case and may argue from this testimony that his confession was false.

 The Court of Appeals also excluded the entirety of Wendt’s testimony because it would be unhelpful. The Court’s analysis is similarly faulty because, like the circuit court, the Court of Appeals failed to recognize that this part of Wendt’s testimony is independent of the other testimony regarding false-confession literature.

 The dissent opines that Wendt’s testimony regarding the psychological tests he performed is “irrelevant,” post at 156, but as we have explained it is unnecessary to reach this issue because this determination is to be made by the circuit court on remand.

 MRE 403.

 People v Crawford, 458 Mich 376, 398; 582 NW2d 785 (1998) (emphasis added).

 The Court of Appeals’ MRE 403 analysis also found that all the proffered expert testimony generally had little probative value and a danger of high prejudice because, in its view, the expert testimony “would interfere with the jury’s role in determining the credibility and weight of the confession.” Kowalski, unpub op at 5. This analysis does not take account of safeguards typically applied to expert testimony in similar contexts. In Peterson we observed that an expert may not “vouch for the credibility of a witness” and that a limiting instruction could ensure the jury used the testimony only for its proper purpose. Peterson, 450 Mich at 376. Similarly, in Christel, we observed that an expert is prohibited from “comment[ing] on the complainant’s truthfulness.” Christel, 449 Mich at 580. As we have explained, these same limitations apply to the expert testimony here, and a limiting instruction is available should the parties request it. Thus, the Court of Appeals’ analysis is deficient because it failed to consider the safeguards that might negate the danger that the expert testimony will interfere with the jury’s role.

 The dissent would exclude all of Wendt’s testimony under MRE 403 as a matter of law, arguing that the testimony is not “even ‘marginally probative evidence.’ ” Post at 157. It is unnecessary to consider under MRE 403 the portion of Wendt’s testimony regarding false-confession literature, because it was properly excluded under MRE 702. Further, because the circuit court must consider the admissibility of the psychological testing evidence under MRE 702 on remand before reaching MRE 403, it is not necessary to conclude, as the dissent does, that this type of testimony is inadmissible under MRE 403 as a matter of law. Moreover, because Wendt’s proposed expert testimony might have some probative value, the circuit court must undertake a new analysis of MRE 403 if it concludes on remand that the psychological testing evidence satisfies the requirements of MRE 702.

 Crane, 476 US at 690 (quotation marks and citation omitted).

 Washington v Texas, 388 US 14, 18; 87 S Ct 1920; 18 L Ed 2d 1019 (1967).

 Id. at 19.

 United States v Scheffer, 523 US 303, 308; 118 S Ct 1261; 140 L Ed 2d 413 (1998).

 Id. (quotation marks and citation omitted).

 People v Hayes, 421 Mich 271, 279; 364 NW2d 635 (1984), quoting Chambers v Mississippi, 410 US 284, 302; 93 S Ct 1038; 35 L Ed 2d 297 (1973).

 Daubert, 509 US at 589.

 Id. at 594-595.

 Gilbert, 470 Mich at 781 (“[T)he court’s fundamental duty [is to] ensur[e] that all expert opinion testimony — regardless of whether the testimony is based on “novel” science — is reliable.”).

 Id. at 779-783.

 Rock v Arkansas, 483 US 44; 107 S Ct 2704; 97 L Ed 2d 37 (1987).

 Id. at 56 n 12.

 Holmes v South Carolina, 547 US 319, 326-327; 126 S Ct 1727; 164 L Ed 2d 503 (2006) (quotation marks and citations omitted).

 Defendant’s argument that Crane v Kentucky, 476 US 683, prohibits the circuit court from excluding the proffered evidence is without merit. In Crane, the United States Supreme Court held that a defendant had a right to argue to a jury that his confession was unreliable even after a judge had determined it to be voluntary. The Court held that excluding all testimony about the circumstances surrounding his confession was a constitutional violation of the defendant’s right to present a defense because it excluded “competent, reliable evidence.” Id. at 690. Yet Crane also acknowledged that states may “exclude evidence through the application of evidentiary rules that themselves serve the interests of fairness and reliability — even if the defendant would prefer to see that evidence admitted.” Id.

 Indeed, the dissent cites extensively the views of the dissenting justices in both Peterson and Christel. While those more narrow viewpoints are undoubtedly aligned with the dissenting justice’s views in this case, those views failed to carry the day and are not the law of our state.

 Post at 148 (emphasis omitted).

 Post at 166.

 Post at 166.

 Post at 148-149.

 Post at 167-168.