# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

     Plaintiff-Appellee,

v

JAMES PAUL ZACHARKO, II,

     Defendant-Appellant.

UNPUBLISHED
December 22, 2015

No. 322221
St. Joseph Circuit Court
LC No. 13-018355-FH

Before: OWENS, P.J., and MURPHY and HOEKSTRA, JJ.

PER CURIAM.

Defendant appeals as of right his convictions following a jury trial of 16 counts of third-degree criminal sexual conduct (CSC III), MCL 750.520d(1)(a) (victim 13 through 15 years old). The jury acquitted defendant of seven additional counts of CSC III. The trial court sentenced defendant to concurrent prison terms of 10 to 15 years for each count. We affirm.

The charges in this case stem from a sexual relationship between defendant and the 14-year-old daughter of his former girlfriend. At trial, the victim, her mother, the investigating officer, and an expert witness for each side testified. After defendant's convictions, defendant filed a motion for new trial and received a *Ginther*[1] hearing on the issues related to his claims of ineffective assistance of counsel. After the hearing and additional briefing, the trial court concluded that none of defendant's claims had merit. Defendant now appeals.

## I. EXPERT TESTIMONY – DR. OKLA

Defendant first claims that the trial court erred in limiting the expert testimony of Katherine Okla, Ph.D., who testified on his behalf. We review a trial court's decision to admit expert witness testimony for an abuse of discretion. *People v Matuszak*, 263 Mich App 42, 47; 687 NW2d 342 (2004). An abuse of discretion occurs when a court selects an outcome that falls outside the range of reasonable and principled outcomes. *People v Babcock*, 469 Mich 247, 269; 666 NW2d 231 (2003). Ordinarily, a trial court's decision on a close evidentiary question cannot constitute an abuse of discretion. *People v Sabin (After Remand)*, 463 Mich 43, 67; 614 NW2d

---

[1] *People v Ginther*, 390 Mich 436; 212 NW2d 922 (1973).

888 (2000). "When the decision regarding the admission of evidence involves a preliminary question of law, such as whether a statute or rule of evidence precludes admissibility of the evidence, the issue is reviewed de novo." *People v Washington*, 468 Mich 667, 670-671; 664 NW2d 203 (2003).

During the trial, the trial court limited Okla's testimony pursuant to what it believed had been a stipulation between the parties; a purported stipulation that was never reduced to an order or writing. The court restricted Okla's expert testimony to the field of behaviors and characteristics of sexually abused children, which was the sole topic addressed by the prosecution's expert witness, James Henry, Ph.D. The trial court concluded that the stipulation had entailed limiting the testimony of each party's expert to that particular field or topic. Defendant sought to have Okla testify with respect to the additional areas of clinical psychology, child and adolescent development, memory and suggestibility, and forensic interviewing techniques and protocols, all in the context of claims of child sexual abuse and investigations of the abuse. We note that there is no dispute that Okla had the expert qualifications to testify on such matters, and the trial court expressly acknowledged that she was so qualified, but it nevertheless limited her testimony on the basis of the claimed stipulation.

At the *Ginther* hearing, trial counsel for defendant adamantly testified that he had never agreed to any limitation being placed on Okla's testimony, except to the extent required by law, and that he had agreed not to challenge Henry's qualifications to testify in return for a similar promise by the prosecutor as to Okla. Regardless, the trial court found that a stipulation between the parties to limit the scope of Okla's and Henry's testimony had indeed taken place. The trial court opined that in stipulating to the scope of Okla's testimony, defense counsel had made a tactical decision that he was not going to seek to have her testify to anything more than Henry was allowed to address and then hope he could get more in during trial. Moreover, the court concluded that even if it had held a full hearing to determine whether to limit Okla's testimony, absent any consideration of the stipulation, it still would not have permitted her to testify about forensic interviewing protocols and other areas that defendant had wished to explore. With respect to forensic interviewing protocols, the trial court observed and ruled that "[t]here was absolutely no testimony from the [interviewing] officer[]" that he was "familiar with the forensic protocol[s]" or that he had employed such protocols when interviewing the victim, thereby rendering Okla's testimony irrelevant. The trial court further concluded that the excluded testimony would have confused the jury, because there was "absolutely no requirement that the police follow the forensic protocol[s]."[2]

We initially conclude that, upon careful scrutiny of the entire record, the only evident stipulation was an agreement by defense counsel to limit Okla's testimony in accordance with

---

[2] The investigating officer who interviewed the victim did not delve into details regarding the interview when he testified at trial. He did explain that a video recording of the interview had been made, but the recording was not admitted into evidence. The officer did testify, absent any elaboration, that he had been trained not to ask leading questions when conducting interviews. The heart of the prosecution's case rested on the direct testimony of the victim.

the parameters of the law applicable to experts testifying in sexual abuse cases involving child victims. This unremarkable agreement was reached after the prosecution had filed a motion in limine that reflected a concern that Okla was planning to testify "regarding *this* particular victim's veracity," which of course would have been inadmissible. See *People v Douglas*, 496 Mich 557, 583; 852 NW2d 587 (2014) (an expert is not permitted to vouch for the veracity of a victim). The only other possible agreement revealed by the record, as claimed by defense counsel at the *Ginther* hearing and as to which there was no evidence to the contrary, was a stipulation that each other's expert was indeed an expert who was qualified to testify with respect to his or her field or fields of claimed expertise. We find no record support for an agreement or stipulation by defense counsel that Okla's testimony was to be limited to the subject of behaviors and characteristics of sexually abused children. Accordingly, we proceed to address the trial court's ruling that, regardless of any stipulation, Okla's proffered testimony regarding forensic interviewing protocols and suggestibility would have been irrelevant, MRE 401-402, and would have confused the jury, MRE 403.[3]

The admissibility of expert testimony is governed by MRE 702, which provides:

> If the court determines that scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise if (1) the testimony is based on sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

"A court considering whether to admit expert testimony under MRE 702 acts as a gatekeeper and has a fundamental duty to ensure that the proffered expert testimony is both relevant and reliable." *People v Kowalski*, 492 Mich 106, 120; 821 NW2d 14 (2012).

Under the Michigan Child Protection Law, MCL 722.621 *et seq.*, which encompasses child sexual abuse, "[t]he department and *law enforcement officials shall conduct* investigations in compliance with the protocols adopted and implemented as required by subsection (6)." MCL 722.628(4) (emphasis added). And subsection (6) of MCL 722.628 provides:

> In each county, the prosecuting attorney and the department shall adopt and implement standard child abuse and neglect investigation and interview protocols using as a model the protocols developed by the governor's task force on children's justice as published in FIA Publication 794 (revised 8-98) and FIA Publication 779 (8-98) [Forensic Interviewing Protocol], or an updated version of those publications.

---

[3] While defendant in his brief on appeal initially mentions all of the various areas of Okla's expertise that the trial court excluded her from testifying on, he ultimately focuses his argument on forensic interviewing protocols and suggestibility.

Accordingly, in a CSC case involving a child victim, law enforcement officials must conduct their investigations in compliance with forensic interviewing protocols adopted within their counties and modeled on task force publications. And compliance or lack of compliance with such protocols is certainly a matter that can generally be explored at trial through the testimony of a qualified defense expert.[4] Even absent the statutory provisions, forensic interviewing protocols with respect to child victims of sexual abuse are generally a relevant topic of testimony in CSC trials, bearing on issues regarding the accuracy, validity, and potential tainting of CSC allegations. See *People v Trakhtenberg*, 493 Mich 38, 54-55; 826 NW2d 136 (2012) (in a CSC case turning solely on credibility, a reasonable attorney would have consulted with an expert on such matters as forensic interviewing protocols in order to develop a defense). To the extent that the victim's interview by the investigating officer conceivably may have tainted her allegations of sexual acts committed by defendant, the admission of expert testimony regarding proper forensic interviewing protocols was relevant, as it would have "assist[ed] the trier of fact to understand the evidence or to determine a fact in issue," MRE 702. This is also true in the context of "suggestibility" arising out of the police interview and the interactions and communications between the victim and her mother about defendant, which at times, according to some of the evidence, was sexually graphic. With respect to the trial court's conclusion that the excluded expert testimony would have confused the jury because the investigating officer was not required to follow any forensic interviewing protocols, MCL 722.628(4) and (6) directly establish the error in that proposition.

Despite the trial court's error in limiting Okla's testimony, reversal of defendant's convictions is not warranted, given that we cannot conclude that the error affected the outcome of the proceedings. "No . . . verdict shall be set aside or reversed or a new trial be granted by any court of this state in any criminal case, on the ground of . . . improper . . . rejection of evidence, . . . unless in the opinion of the court, after an examination of the entire cause, it shall affirmatively appear that the error complained of has resulted in a miscarriage of justice." MCL 769.26; see also *People v Lukity*, 460 Mich 484, 495; 596 NW2d 607 (1999) (Under MCL 769.26, the effect of an error is evaluated by assessing it in the context of the untainted evidence in order to determine whether it is more probable than not that a different outcome would have resulted absent the error.).

Okla was able to give some testimony that supported defendant's theory of the case, addressing factual circumstances supported by evidence in the record, but framed as hypotheticals, and that could reasonably be viewed as undermining the victim's credibility or the accuracy of her allegations. Okla testified that it was uncommon for complainants to deny sexual abuse allegations when specifically asked by others, noting that a "large majority of children, when they are asked, . . . do give a complete disclosure." She also indicated that a high percentage of children who disclose sexual abuse do not later recant the allegations. Okla next

---

[4] In an affidavit submitted by Okla, which indicated that she had reviewed the videotape of the victim's interview by the investigating officer, she averred that "there is no evidence of adhering to proper forensic interview protocol by engaging in alternative hypothesis-testing regarding the timing, possible reasons for, and sources of allegations."

testified that when there is a very short period of time between an initial communication by an alleged perpetrator to a victim and an act of sex between the two, it is not suggestive of grooming. She further stated that self-harm was not necessarily reflective of abuse and that it was healthy and appropriate for teenagers to distance themselves from their parents, as opposed to being indicative of sexual abuse. Okla additionally testified that when a complainant keeps varying the number of sexual acts that purportedly occurred in discussions with others or in testimony, "it would . . . raise questions about was there any motivation to distort or mischaracterize or even intentionally deceive." When asked whether she would be concerned by the fact that a complainant had been questioned by several people about allegations of sexual abuse prior to a police interview, Okla responded, "that's a huge indication of taint or suggestibility." Defense counsel then asked Okla to explain that conclusion, and she testified, absent objection, as follows:

> In general, if you ask a person questions[,] you are introducing notions or concepts, you're asking them to focus on a particular area or event or detail. You're [sic] emotional reaction, your facial expression, asking a person to even imagine doing some action causes your brain to fire in a particular way that makes it seem familiar.

> So you – you can add confidence, you can add details, you can change the memory – and we do this, all of us do this – you – you construct memories that become in your own mind more coherent and more consistent with what you think other people want to or believe happened.

Okla next testified as follows, after defense counsel asked her about research on false allegations of sexual abuse:

> Like a . . . fake memory, a not . . . accurate memory that have been either induced in an experiment or just by interviewing kids after events that show that kids do sometimes make wrong, inaccurate statements because they believe what they're saying, and other times that they have made statements that they know factually are not true for various different reasons that are, for example, outlined in the American Professional Society on the Abuse of Children, where they talk about [how] investigators need to be very careful to consider all these possible motivations for kids to say things that are not true . . . .

> In order to have a good investigation, whether you want to call it a "forensic interview" or not, you have to keep in mind all the possibilities for why a child might come to say what they're saying, and that does sometimes include deliberate deceit, but sometimes it's mistaken.

Defense counsel next broached the subject of environmental factors that can influence disclosures of sexual abuse, and Okla testified:

> It's an alternative explanation or an alternative hypothesis to take into account and to try and rule out as an explanation for the motives of making a

disclosure, which might be, "I want to get out of trouble," "I don't want to have this person in my life anymore," "I need to explain my bad grades."

There are all kinds of reasons that are widely published as possible reasons to explore as underlying motivations in making disclosures.

It doesn't necessarily prove that it's not . . . true or false, but there are things that can affect or influence, as you said, the timing and the nature of the disclosure.

Shortly after this testimony, the trial court itself asked Okla for clarification with respect to environmental factors influencing the disclosure of sexual abuse, and Okla testified that environmental factors can be "significant enough that we try in the protocols . . . to make sure to look into" such factors in order to rule them out.

As reflected in Okla's testimony, although the trial court had ruled to limit her testimony to the area of behaviors and characteristics of sexually abused children, there can be no dispute that her actual testimony wandered beyond that restriction at numerous points, touching on some of the very subjects that defendant wished to present to the jury. We recognize that Okla would have been able to testify in much greater detail on the banned areas of expertise without the court's ruling, but we cannot conclude that defendant has established the requisite prejudice to warrant reversal. This is especially true where, in conjunction with consideration of the testimony that Okla was allowed to give at trial, the victim was 14 years old when the events transpired and when she spoke to the investigating officer, not a younger child more easily susceptible to improper questioning or influence, thereby lessening the danger of taint. And further, this case did not involve one or just a few sexual acts; rather, defendant and the victim were involved in an ongoing sexual relationship, entailing a high number of sexual encounters. Moreover, the investigating officer's testimony, although brief, indicated that he had not used leading questions in interviewing the victim and that he had failed to elicit much in terms of details – there was not even a discussion of oral sex, which was the subject of 12 counts. Given all of this context, and despite being relevant, expert testimony on forensic interviewing protocols and suggestibility would have added very little to assessing the accuracy of the victim's claim that she had sex with defendant. Additionally, the untainted evidence of an improper relationship between defendant and the victim, evidenced primarily by text messages, was strong and corroborated much of the victim's testimony. In a telling text message from defendant to the victim, he stated, "I promise to see you as much as possible. We just need to be careful." Finally, defendant fully engaged in aggressive cross-examination of the victim in an effort to impeach her credibility, succeeding in part in light of the acquittals on seven counts. In sum, despite the trial court's errors, we decline to reverse the verdict on the basis that Okla's testimony was impermissibly limited, considering that defendant has not established a

miscarriage of justice, i.e., that it is more probable than not that he would have been acquitted on the charges but for the limitation placed on the scope of Okla's testimony.[5]

## II. EXPERT TESTIMONY – DR. HENRY

Defendant's appellate arguments with respect to Henry are largely based on MCR 6.201, which provides, in pertinent part:

> (A) In addition to disclosures required by provisions of law other than MCL 767.94a, a party upon request must provide all other parties:
>
> . . .
>
> (3) the curriculum vitae [CV] of an expert the party may call at trial and either a report by the expert or a written description of the substance of the proposed testimony of the expert, the expert's opinion, and the underlying basis of that opinion[.]

Defendant did make a demand for discovery, requesting, in part, the materials and information set forth in MCR 6.201(A)(3). Defendant claims that he was provided Henry's CV and four transcript excerpts of Henry's prior testimony in other cases, but not a report or a written description of the substance of Henry's proposed testimony in this case, nor Henry's opinion and the underlying basis of his opinion relative to this case, as mandated by MCR 6.201(A)(3). Defendant argues that defense counsel was ineffective for failing to demand compliance with MCR 6.201(A)(3). Defendant also contends that the trial court failed to evaluate the reliability of the data and methodologies, MRE 702, underlying Henry's opinions and conclusions. More particularly, defendant raises issues regarding Henry's testimony about memory and patterns of and delays in disclosure, which were premised on a study, conducted by Henry himself, looking at 90 children who had been sexually abused. Defendant further maintains that defense counsel was ineffective for failing to object to the admission of this testimony and for failing to effectively cross examine Henry with respect to the testimony.

Whether a defendant received the effective assistance of counsel is a mixed question of fact and law that we review, respectively, for clear error and de novo. *People v Ackley*, 497 Mich 381, 388; __ NW2d __ (2015). "To obtain relief for the denial of the effective assistance of counsel, the defendant must show that counsel's performance fell short of . . . [an] objective standard of reasonableness and that, but for counsel's deficient performance, there is a reasonable probability that the outcome . . . would have been different." *Id.* at 389 (citations and quotation

---

[5] We note that our Supreme Court in *Trakhtenberg*, 493 Mich 38, a CSC case in which credibility was paramount, held that defense counsel was ineffective *and* that the defendant was prejudiced, where counsel had failed, in part, to utilize an expert regarding forensic interviewing protocols. However, counsel in *Trakhtenberg* failed to procure any expert testimony whatsoever, and the victim there was eight years old, with the case involving just a few instances of sexual abuse, absent any damaging evidence comparable to the text messages presented here.

marks omitted). A defendant must overcome the strong presumption that counsel's performance constituted sound trial strategy, but an appellate court is not permitted to insulate the review of counsel's performance by simply calling it trial strategy – the strategy must be sound, with decisions being objectively reasonable. *Id.* at 388-389. We must determine whether strategic choices were made after less than complete investigation or if a reasonable decision made an investigation unnecessary. *Id.* at 389.

With respect to the arguments under MCR 6.201(A)(3), Henry gave fairly brief testimony regarding behaviors and characteristics of sexually abused children, opining on issues related to delayed disclosure, failure to disclose when first questioned by others, emotional connections between abusers and the abused, grooming, self-harm, traumatic memory, distancing from parents, and "testing" reactions through hints and incremental release of information about abuse. It is important to understand that, as repeatedly pointed out by the prosecutor during the proceedings, Henry had not been provided any information or documents concerning the facts specific to this case. Henry's testimony was extremely general in nature. It is entirely possible that the partial transcripts of Henry's testimony from other criminal cases that were provided to defense counsel covered the very same areas and revealed the very same opinions that Henry discussed in his testimony here, e.g., there is generally a delay by children in disclosing sexual abuse, which would explain why the transcripts were given to defense counsel. Those transcripts could certainly constitute a "written description" of the substance of Henry's proposed testimony, his opinions, and the underlying bases of those opinions in this case, satisfying MCR 6.201(A)(3). A "defendant has the burden of establishing the factual predicate for [a] claim of ineffective assistance of counsel[.]" *People v Hoag*, 460 Mich 1, 6; 594 NW2d 57 (1999). Defendant did not submit the transcript excerpts in relationship to the *Ginther* hearing, nor did defense counsel testify with respect to the content of those transcript passages. Accordingly, defendant has not satisfied his burden to establish the factual predicate of his ineffective assistance claim with respect to his arguments under MCR 6.201(A)(3). Moreover, defendant has failed to show that he was actually prejudiced by Henry's general and occasionally helpful testimony regarding behaviors and characteristics of children who are sexually abused, especially in light of the untainted evidence of guilt.

With respect to Henry's testimony concerning his study of 90 sexually abused children and his opinions that flowed from the study, defense counsel did not challenge Henry's testimony, and we are not prepared to rule that the trial court was obligated, in that situation and given the nature of Henry's views, to sua sponte undertake its own analysis under MRE 702 to determine whether the testimony was based on sufficient facts or data or whether the testimony was the product of reliable principles and methods. Moreover, in the context of plain-error analysis, defendant has failed to show that there was a plain error in admitting the evidence, i.e., that it was plain and obvious that Henry's testimony regarding the study and the opinions based on the study were inadmissible under MRE 702. *People v Carines*, 460 Mich 750, 763-764; 597 NW2d 130 (1999). Nor has defendant shown the requisite prejudice, or that the testimony resulted in the conviction of an actually innocent person, or that the testimony seriously affected the fairness, integrity, or public reputation of the proceedings. *Id.* In regard to the associated claim of ineffective assistance of counsel, we agree with the trial court that defense counsel exercised a reasonable and sound trial strategy by not challenging Henry directly on cross-examination with respect to the study and his opinions, instead choosing to counter Henry's testimony with Okla's testimony. And, again, the requisite prejudice has not been shown.

## III. THE VERDICT FORM

Although defendant was originally charged with 26 counts of CSC III, at the conclusion of trial, the prosecution dismissed three counts, leaving 23 counts, 11 of which concerned vaginal intercourse and 12 of which concerned oral sex (fellatio). Broken down, the 11 counts regarding intercourse encompassed eight instances in a field, two instances in the victim's home, and one instance in a yard; the 12 counts of oral sex encompassed eight instances in a field, two instances in the victim's home, one instance in a yard, and one instance in a car. The jury convicted defendant on eight counts related to intercourse and eight counts related to oral sex, acquitting him as to the seven remaining counts. The verdict form listed the 23 counts, with the first 11 counts expressly pertaining to intercourse and the next 12 counts expressly pertaining to oral sex, absent any additional indication of the nature, location, date, or circumstances of each count. On appeal, defendant argues that his due process rights were violated because the verdict form was deficient, in that, given the lack of specificity relative to each count, the jury may not have been unanimous on the counts upon which he was convicted. Defendant also argues that defense counsel was ineffective for failing to demand identification of the factual predicate for each count on the verdict form.

Defendant correctly observes that he was entitled to a unanimous jury verdict and that the trial court was obligated to so instruct the jury. MCR 6.410(B); *People v Cooks*, 446 Mich 503, 510-511; 521 NW2d 275 (1994). "[W]here materially identical evidence is presented with respect to each act, and there is no juror confusion, a general unanimity instruction will suffice." *Cooks*, 446 Mich at 512-513. Here, after reciting the language in the verdict form to the jury as to all 23 counts, the trial court then directed the jury as follows:

> Now you're going to get the jury instructions to go with you. You're going to get one of these verdict forms that the foreperson will be responsible for. You have [to] reach a unanimous verdict on each count, so you have to go count by count, and when you have a unanimous verdict you can check the box.

> You have to be in agreement not only with the elements, *but also that you're talking about the same occurrence. So one can't be thinking of one time and one can't be thinking of another. You all have to be talking about the same incident and then be unanimous in your decision on that as to guilt or not guilty.* Do you all understand that? Okay. [Emphasis added.]

Jurors are presumed to follow their instructions. *People v Mahone*, 294 Mich App 208, 212; 816 NW2d 436 (2011).

Although each count in the verdict form did not identify, beyond indicating the type of sex act alleged, the specifics of the sex act, such as when and where it took place, the jurors, in light of the court's instruction, were fully aware of the fact that they had to be unanimous and be discussing the same incident, whether it was oral sex in the field on one day or intercourse in the house on another day, when addressing each individual count. Indeed, the quoted jury instruction went beyond a mere general unanimity instruction; it was specific. We cannot envision any juror confusion under the circumstances; therefore, the trial court did not err and counsel's performance was not deficient in relation to the verdict form. Reversal is unwarranted.

## IV.  CHARACTER EVIDENCE

Relying on MRE 404(b), defendant next argues that the trial court erred by admitting improper and prejudicial character evidence and that counsel was ineffective for failing to object to the evidence or to request redaction.  At issue are statements defendant wrote in communications to the victim and her mother.  Two are from text messages he sent to the victim, which referred to defendant having spent "a few days in jail" and having his "hands covered in [a] filthy female pot plant."  The other statements are from an email defendant sent to the victim's mother, which referenced defendant "getting high" in front of the victim.  In the email, defendant also stated, "[I]f I lose my job I will never get another.  I have too much of a record to ever get hired again."  In considering defendant's claim following the *Ginther* hearing, the trial court concluded that the evidence was admissible and, therefore, it was not unreasonable for defense counsel not to object to its admission.

In *People v Jackson*, 498 Mich 246, 259-260; 869 NW2d 253 (2015), our Supreme Court recently reiterated the well-established framework for analyzing the admissibility of other-acts evidence under MRE 404(b):

> "To admit evidence under MRE 404(b), the prosecutor must first establish that the evidence is logically relevant to a material fact in the case, as required by MRE 401 and MRE 402, and is *not* simply evidence of the defendant's character or relevant to his propensity to act in conformance with his character. The prosecution thus bears an initial burden to show that the proffered evidence is relevant to a proper purpose under the nonexclusive list in MRE 404(b)(1) or is otherwise probative of a fact other than the defendant's character or criminal propensity. Evidence relevant to a noncharacter purpose is *admissible* under MRE 404(b) *even if* it also reflects on a defendant's character. Evidence is *inadmissible* under this rule *only* if it is relevant solely to the defendant's character or criminal propensity. Any undue prejudice that arises because the evidence also unavoidably reflects the defendant's character is then considered under the MRE 403 balancing test, which permits the court to exclude relevant evidence if its probative value is substantially outweighed by the danger of unfair prejudice. MRE 403. Finally, upon request, the trial court may provide a limiting instruction to the jury under MRE 105 to specify that the jury may consider the evidence only for proper, noncharacter purposes."  [Citations, ellipses, and internal quotation marks omitted.]

Here, the statements in defendant's text messages to the victim touching on jail time and a marijuana plant, as well as the statement in defendant's email to the victim's mother about getting high in front of the victim, were not offered to show defendant's propensity to use drugs or to otherwise engage in criminal behavior.  Rather, the statements were offered to show the nature of the relationship between defendant and the victim and were reflective of grooming and

manipulation by defendant, making the statements relevant to the issues in the case.[6] And the probative value of the evidence was not substantially outweighed by the danger of unfair prejudice. There was no plain error in admitting these statements, *Carines*, 460 Mich at 763-764, and counsel was not ineffective for failing to raise a futile objection, *People v Strickland*, 293 Mich App 393, 398; 810 NW2d 660 (2011). With respect to the email statement by defendant that he had too much of a record to get a new job if he were fired, the statement again was not offered for propensity purposes. Rather, the statement, when read in context, showed the effort made by defendant to dissuade the victim's mother from having CSC charges pressed against him. We also note that the statement could be interpreted as meaning that defendant would have too much of a record if charges were pressed against him, not that he had too much of an existing record. Regardless, assuming error in admitting the statement and deficient performance by counsel, in light of the proper admission of the jail-time statement made by defendant to the victim, the briefness of the reference, which was buried in an extensive email, and the trial court's cautionary and limiting instruction on "other bad acts," defendant has entirely failed to establish the necessary prejudice. Reversal is unwarranted.

## V. LABORATORY REPORT REGARDING FINGERPRINTS

Defendant finally argues that trial counsel was ineffective for failing to obtain a fingerprint report and for failing to call the lab analyst as a witness to admit the fingerprint report as evidence. The report concerned a bag with a phone that was recovered near the victim's house. The victim had testified that defendant had been providing her with prepaid cell phones so that they could continue to communicate after her mother had told defendant to stop communicating with the victim. There is no dispute that the report existed and established that defendant's fingerprints were not on the bag or phone. And there was testimony that the materials had been sent to a state police lab for testing, but the jury never heard any evidence of the actual results. Defense counsel had attempted to introduce the fingerprint results through the testimony of the investigating officer, as opposed to a lab analyst, and the trial court rebuked counsel's effort. Defense counsel then employed the strategy of simply indicating to the jury that, given the failure by the prosecution to show that defendant's fingerprints were actually on the bag or phone, the jury could infer that there were no such prints.

In denying defendant's claim of ineffective assistance of counsel on this issue, the trial court determined that trial counsel was aware of the report and its contents and that counsel had made a strategic decision not to delve into the matter. We question the soundness of this reasoning. Regardless, assuming deficient performance by counsel, defendant simply cannot establish the requisite prejudice. The issue was collateral, the lack of defendant's fingerprints on the materials was of minimal evidentiary value in the context of all the other circumstances in the case, and the jury ultimately entered into deliberations with the knowledge that the prosecution

---

[6] The statement to the victim referencing a "few days in jail" was made in the context of defendant expressing to the victim that he would protect her and that she would never have to "take a bullet" if he could help it.

did not submit any evidence showing defendant's prints on the materials despite the testing. Reversal is unwarranted.

Affirmed.


/s/ Donald S. Owens
/s/ William B. Murphy
/s/ Joel P. Hoekstra