*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

CARA CHRISTINE BOWDEN,

        Defendant-Appellant.

FOR PUBLICATION
November 10, 2022

No. 357976
Ottawa Circuit Court
LC No. 21-044535-AR

Before: BORRELLO, P.J., and M. J. KELLY and REDFORD, JJ.

REDFORD, J. (*dissenting*)

From the majority opinion I respectfully dissent. I conclude that the circuit court correctly affirmed the district court's order qualifying Deputy Schaller as an expert Drug Recognition Evaluator (DRE) permitted to provide an opinion whether defendant operated her vehicle under the influence of marijuana to a degree that rendered her unsafe to drive. Defendant argues that Deputy Schaller should be precluded from testifying regarding her impairment because the DRE protocols do not permit detection of impairment with absolute scientific certainty. The majority agrees that his testimony should be precluded because the studies on which the prosecution relied only validated the DRE protocol's accuracy in determining the presence of a substance in a subject's blood but did not validate the DRE protocol for determining a subject's degree of impairment. I disagree because evidence established that Deputy Schaller can reliably use the DRE protocol as an investigative tool among others to detect a person's impairment and inability to safely drive a motor vehicle because of marijuana use.

## I. FACTUAL BACKGROUND

Deputy Schaller testified that he worked as a deputy safety officer of the Ottawa County Sheriff's Office since 2004 primarily as a road patrol officer. He received training in standardized field sobriety tests (SFSTs) at the police academy, later became Advanced Roadside Impaired Driving Enforcement (ARIDE) certified, and became certified as a DRE after 80 hours of classroom work involving instruction in medical conditions, observable signs of drug impairment from different drugs, followed by fieldwork in which he performed tests on subjects and a final examination. He testified that he did 12 DRE evaluations during his training and 4 additional

-1-

evaluations during 2019, 45 evaluations in 2020, and had done 3 so far in 2021. He entered his evaluations into the National Highway Traffic Safety Administration's (NHTSA) data tracking website which verified his evaluations as 97% accurate.

Following defendant's arrest, Deputy Schaller conducted on defendant the 12-step DRE protocol. Deputy Schaller testified that the DRE protocol aids in determining the category of drug of which the suspect might be under the influence. He explained that the modified Romberg test enables the evaluation of the suspect's ability to follow instructions, divide attention to perform multiple tasks not unlike that experienced in driving a motor vehicle, and the detection of impairment and other observable physical traits indicative of possible impairment. During the walk-and-turn and one-leg stand tests, he monitors each aspect of a suspect's performance including ability to listen to and exactly follow instructions, and perform the steps of each test without interruption, miscue, or need to balance, pause, or stop. The finger-to-nose test, another divided attention test, tests whether the suspect can follow instructions and do multiple tasks by having the suspect touch alternately the tip of the nose with a fingertip of each hand in the sequence the officer directs. During the Divided Attention Psychophysical Tests administration, Deputy Schaller also looks for observable clues and general indicators, among other things, body tremors, eyelid tremors, jerky movements, imbalance, and abnormal time perception.

After conducting the DRE protocol with defendant following her arrest, Deputy Schaller concluded, based upon the totality of all the information obtained in the investigation, that defendant was under the influence of and impaired by marijuana, making her unable to safely operate a motor vehicle. The Ottawa County Sheriff's Office charged defendant with one count of operating while intoxicated in violation of MCL 257.625(1). Defendant's toxicology lab test later confirmed that her blood contained delta-9 tetrahydrocannabinol (THC), the active ingredient in marijuana.

Defendant moved in limine in the district court to preclude the introduction of evidence "related to any and all tests of defendant's physiology, motor skills, comprehension, or coordination." The prosecution moved for the district court to qualify Deputy Schaller as an expert in the field of Drug Evaluation and Classification and requested that Deputy Schaller be allowed to testify and render expert opinions as a DRE. The district court conducted a two-day evidentiary hearing on the parties' competing motions at which Deputies White, Williams, and Schaller testified. Deputy White testified regarding the traffic stop, his detection of the presence of marijuana, his observance of defendant's bloodshot eyes, and defendant's performance during the SFSTs that he administered. Deputy Williams testified regarding defendant's performance of the tests that he administered. Both deputies testified that they found deficiencies in defendant's performance of some of the tests which caused them to believe that probable cause existed to arrest defendant for operating her vehicle while under the influence of a controlled substance in violation of MCL 257.625.

Deputy Schaller testified regarding the training he received to become DRE certified and his experience in performing DRE evaluations. Deputy Schaller testified at length regarding the DRE protocol evaluation process and the development of the DRE protocols in the late 1970s by the Los Angeles Police Department which later partnered with the NHTSA to perform validation studies in a laboratory setting and in the field with further development over the next 40 years. He explained that around 1984 the Johns Hopkins University conducted a lab-based validation double-

blind study with 80 volunteers who were administered drugs from specified categories in different doses and then evaluated using the DRE protocols to determine the success and error rate of using that method of detection of drug usage.[1] The Johns Hopkins University study is referred to as the Bigelow Study. The study found a 90% success rate in using the DRE protocols for determining whether subjects were under the influence of drugs, and had a 98% success rate in determining if subjects were not impaired.

Deputy Schaller also testified regarding a 1986 field validation study conducted by the Los Angeles Police Department, referred to as the Compton Study,[2] in which 173 individuals who had been arrested for impaired-driving offenses other than alcohol were evaluated by DRE experts using the DRE protocols. That study validated the DRE program's reliability as a tool for use by law enforcement in investigating and determining drug impairment.

Deputy Schaller further testified regarding his observations of defendant during the traffic stop including that defendant had an odor of marijuana coming from both herself and from the vehicle in which she had been the sole occupant, she displayed bloodshot eyes, and that she told police officers that she had smoked marijuana 30 minutes before the traffic stop. He described in detail his observations of defendant's performance of the SFSTs administered by Deputy White and the ARIDE tests administered by Deputy Williams. Deputy Schaller explained that, before he administered the DRE protocol, he felt that probable cause existed to believe that defendant operated her vehicle under the influence of marijuana. He testified that defendant's performance of the tests under the DRE protocol confirmed that defendant operated her vehicle while impaired. He testified that, in his expert opinion, based upon the totality of the information obtained during the investigation, defendant was under the influence of marijuana and unable to safely operate a motor vehicle.

On cross-examination, Deputy Schaller conceded that persons could have a drug in their system and not be under the influence or impaired. He testified regarding the Bigelow Study and Compton Study and affirmed that he considered them accurate and valid studies. He described in detail the manner in which the Bigelow Study had been conducted under strict controls to permit accurate analysis of the drug impairment evaluation process. He acknowledged that he had some limitations as to knowledge of the study's parameters but explained that the study's goal was to determine in a lab setting whether the DRE protocol served as a valid method of determining if people were under the influence of certain drugs. He affirmed that the study did not involve subjects actual driving motor vehicles. The DRE protocol tested subjects' ability to multitask with divided attention which correlated to operating a vehicle under driving conditions. Deputy Schaller testified that the DRE protocol assisted law enforcement to recognize general signs and indicators of impairment by specific drugs because different drugs affect people in specific ways that can be recognized through the evaluation process. He conceded that the Bigelow Study stated that it did not represent a direct tested validity of the behavioral examination procedures for

---

[1] See National Highway Traffic Safety Administration, *Identifying Types of Drug Intoxication: Laboratory Evaluation of a Subject-Examination Procedure*, May 1985.

[2] See National Highway Traffic Safety Administration, *Field Evaluation of the Los Angeles Police Department Drug Detection Procedure*, February 1986.

detecting and identifying drug intoxication in field situations but noted that it also stated that the study provided "valuable scientific information considering the potential accuracy and utility of such procedures." Deputy Schaller repeated his explanation of the DRE 12-step process and how the totality of all the facts guided the formation of his opinion as to drug usage and impairment. He stated that the later toxicology report confirmed the presence of a drug substance in the suspects' body but did not confirm the opinion of impairment.

Deputy Schaller also testified regarding the Compton Study which he stated had been conducted as a field study to evaluate whether the DRE process served as a valid and useful tool for trained law enforcement officers to determine drug impairment in motor vehicle drivers. He explained that the study's subjects were people who had been arrested and were suspected of being under the influence. The Compton Study determined that the evaluators' opinions regarding the 173 subjects were 92.5% accurate in matching the blood testing results. The analysis revealed that 49% were completely accurate opinions respecting 85 subjects, but 38% were partially accurate opinions respecting 65 subjects. He explained that some subjects had used a combination of drugs and the evaluators identified one but not all drugs because that one drug likely masked the other drug in the subjects' systems. The blood tests revealed more than one drug, and therefore, the evaluators were deemed partially correct. Deputy Schaller affirmed that the study indicated that identification of marijuana through use of the DRE process had a 78% accuracy rate, but other drugs were identified at much lower percentages of accuracy. He explained that the law enforcement officers who participated in the field study derived their impairment opinions from the totality of their observations.

Deputy Schaller testified that the SFSTs were scientifically validated for determining alcohol intoxication and impairment by alcohol. He admitted that he did not know of any validated studies respecting detection of impairment by any other substances. He clarified that the two studies concluded that the DRE protocol is an accurate and reliable tool that enables law enforcement officers to make observations and then derive their impairment opinions based on the totality of the circumstances of the entire investigation. He conceded that to his knowledge the DRE protocol had not been scientifically validated for determination of drug impairment. When asked about a 2017 Report[3] to Congress by NHTSA regarding marijuana-impaired driving, after reviewing the report briefly, Deputy Schaller concurred that the report stated that studies had not shown that THC caused impairment on psychomotor tasks, cognitive, and executive functions as statistically significant impairments, and that it stated that the set of signs and symptoms, and physiological effects that are indicative of marijuana use were not based on driving impairment. Further, he agreed that the report stated that there were no current evidence-based methods for detecting marijuana-impaired driving.

Deputy Schaller affirmed that he prepared an evaluation form for defendant and explained that he concluded that defendant was impaired by marijuana based on the totality of the investigation from the time of the traffic stop, his encounter with defendant at the scene, his observation of defendant's performance of the tests administered at the scene, interactions with

---

[3] Compton, *Marijuana-Impaired Driving-A Report to Congress* (July 2017) (DOT HS 812 440), Washington, DC: National Highway Traffic Safety Administration.

her, statements that she made, evidence in the vehicle, and then the DRE evaluation process. He explained that defendant exhibited visible signs of being under the influence of marijuana including marijuana odor coming from her person and from her vehicle, reddened bloodshot eyes, and she admitted using marijuana 30 minutes before the traffic stop. Deputy Schaller testified that he observed defendant's performance of the SFSTs administered by Deputy White and observed defendant's performance of the ARIDE tests Deputy Williams administered. Defendant also rated her degree of impairment as 3 on a scale of 1-10, where 1 signified no impairment and 10 signified the highest degree of impairment one could experience. Deputy Schaller considered relevant defendant's admission of feeling impaired by the drug. Deputy Schaller explained that defendant was transported to the hospital where her blood was drawn and afterward he administered the drug evaluation. Deputy Schaller stated that at that point the law enforcement officers definitely had probable cause to believe that defendant was under the influence of drugs.

He testified that, before administering the DRE protocol, he had formed a common-sense judgment that defendant appeared under the influence of marijuana based on impairment indicators. He then reiterated all of the observable general indicators and signs that indicate marijuana impairment and described how his experience and training enabled him to draw conclusions regarding marijuana-related impairment. He affirmed that he checked defendant's pupils for dilation, her pulse rate, and blood pressure because those can be indicative of impairment by marijuana. He testified that defendant's pupils, her pulse rate, and blood pressure were normal. He reiterated that he based his impairment opinion on the totality of the facts and indicators presented.

The district court issued a written opinion in which it first determined that Deputy White could testify as a lay witness regarding his contact with defendant and his administration of the SFSTs, but he could not testify as an expert regarding marijuana impairment because of the lack of consensus in the scientific community on the efficacy of using SFSTs to measure marijuana impairment. The district court opined that Deputy White's testimony had probative value regarding defendant's balance, coordination, and other skills necessary for safe operation of a motor vehicle. Similarly, the district court ruled that Deputy Williams could testify as a lay witness regarding his observations. The district court then considered whether Deputy Schaller could testify as a drug recognition expert and render a marijuana-impairment opinion under the requirements of MRE 702 and applicable caselaw. The district court reflected upon Deputy Schaller's training and experience and the DRE program's methodology that he used to evaluate defendant. The district court found that Deputy Schaller's observations were not a scientific or medical diagnosis but were based upon physical signs and behaviors exhibited by defendant. The district court concluded that DRE training enabled officers to recognize observable signs, symptoms, and behaviors sufficient to permit the rendering of opinions on a defendant's state of impairment. The district court found that the Bigelow Study and the Compton Study indicated that officers trained in DRE could identify specific drugs and impairment in the studies' subjects with a high degree of accuracy which made the DRE program sufficiently reliable to meet the MRE 702 requirements. The district court found that Deputy Schaller had "been trained in accordance with the national standards and performed the DRE protocol proficiently." The district court ruled as follows:

> [Deputy Schaller] may testify as to his observations of a defendant's acts, conduct, and appearance, and to give an opinion on the defendant's state of impairment

based on those observations.  He may express an opinion that a suspect's behavior and physical attributes are or are not consistent with the behavioral and physical signs associated with certain categories of drugs.

\* \* \*

Deputy Schaller may testify as a DRE expert.

Defendant sought and the circuit court granted her leave to appeal the district court's ruling. The circuit court analyzed the evidence presented at the district court's two-day hearing.  The circuit court found that defendant's toxicology report and her admission that she used marijuana 30 minutes before the traffic stop indisputably established that she internally possessed marijuana, a controlled substance, while operating her motor vehicle.  The court considered the applicable law and concluded that the standard of proof for a conviction of violation of MCL 257.625(1) required the prosecution to establish that defendant was "under the influence" while operating a motor vehicle.  The circuit court found that the NHTSA 2017 *Marijuana-Impaired Driving-A Report to Congress* indicated that no test available to law enforcement could determine driving impairment caused by marijuana use because the measurable amount of THC in a person did not correlate with impairment.  The circuit court observed that trained DRE officers were being qualified as expert witnesses but no published Michigan case had addressed or decided the reliability and admissibility of testimony regarding application of the DRE protocol or opinion testimony that marijuana use affected a defendant's ability to drive and to what degree.

The circuit court next considered whether the district court had properly exercised its gatekeeper role by correctly applying the three-part test under MRE 702 and the factors articulated in *Daubert v Merrell Dow Pharm, Inc*, 509 US 579, 592-593; 113 S Ct 2786; 125 L Ed 2d 469 (1993), while recognizing the degree of latitude and discretionary authority trial courts have in determining an expert's reliability as expressed in *Kumho Tire Co, Ltd v Carmichael*, 526 US 137, 152-153; 119 S Ct 1167; 143 L Ed 2d 238 (1999), and *People v Kowalski*, 492 Mich 106, 120-121; 821 NW2d 14 (2012).  The circuit court noted that defendant argued that the DRE protocol lacked relevance and reliability because it did not do what it purported to do, i.e., prove that defendant's marijuana intoxication affected her driving or rendered her "under the influence."

The circuit court analyzed the DRE protocol functions and purpose and noted that its purpose was not to conclusively determine the presence of a particular drug which only a later toxicology test could reveal, but to determine whether a person is impaired at the time of the alleged violation and to opine which drug caused the impairment.  The circuit court considered the DRE protocol 12-step process and noted that all DREs conduct it in the same standardized manner and record the results for each step on a standardized form.  The circuit court found that only DRE trained officers who achieved a 75% corroboration rate were certified and that they were required to maintain a minimum accuracy rate and renew certification every two years.

The circuit court concluded that Deputy Schaller's testimony regarding his application of the DRE protocol in the present case and his opinion that defendant had been under the influence of marijuana and unsafe to drive met the relevance and reliability requirements of MRE 702. The circuit court concluded from the record evidence that Deputy Schaller had the requisite training, specialized knowledge, and experience to identify behavioral and physiological signs of

impairment caused by different classes of drugs, plus 17 years' experience as a road patrol deputy interacting with intoxicated drivers. The circuit court found that sufficient facts and data supported the validity of the DRE protocol and Deputy Schaller's testimony regarding defendant's marijuana intoxication. The circuit court concluded that Deputy Schaller formed his opinion based on reliable principles and methods and his testimony would assist the trier of fact in understanding the effects of marijuana intoxication and in determining a fact in issue. The circuit court observed that the degree of defendant's intoxication remained a question for the trier of fact to decide as the ultimate arbiter of whether the prosecution proved all of the elements of the charged offense.

The circuit court also considered whether the probative value of Deputy Schaller's proposed testimony would be substantially outweighed by unfair prejudice, confusion of the issues, misleading of the jury, or be needlessly cumulative. The court concluded that it would not. Respecting defendant's argument that the testimony would be unfairly prejudicial because the jury would attribute undue and preemptive weight to it, the circuit court found no such danger because the trial court could instruct the jury to judge Deputy Schaller's testimony by the same standard applicable to all witnesses and noted that he could be subjected to cross-examination and impeachment through presentation of contradictory evidence. The circuit court, therefore, affirmed the district court's ruling that Deputy Schaller qualified as an expert.

## II. ANALYSIS

Defendant argues that the DRE protocol and its application in her case is inadmissible under MRE 702 because no studies correlate a DRE's ability to determine the degree of impairment in someone who operates a motor vehicle after using marijuana. Defendant's argument, although alluring, is unpersuasive.

The admissibility of expert testimony is governed by MRE 702 which provides:

> If the court determines that scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise if (1) the testimony is based on sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

"A court considering whether to admit expert testimony under MRE 702 acts as a gatekeeper and has a fundamental duty to ensure that the proffered expert testimony is both relevant and reliable." *Kowalski*, 492 Mich at 120 (citation omitted). The court "must ensure that the [expert] testimony (1) will assist the trier of fact to understand a fact in issue, (2) is provided by an expert qualified in the relevant field of knowledge, and (3) is based on reliable data, principles, and methodologies that are applied reliably to the facts of the case." *Id.* "The party proffering the expert's testimony must persuade the court that the expert possesses specialized knowledge which will aid the trier of fact in understanding the evidence or determining a fact in issue." *People v Smith*, 425 Mich 98, 112; 387 NW2d 814 (1986), citing MRE 702. Specialized knowledge must be something beyond the common knowledge of the average person. *Kowalski*, 492 Mich at 123. An expert may be qualified by "knowledge, skill, experience, training, or

education." MRE 702. "MRE 702 requires the trial court to ensure that each aspect of an expert witness's proffered testimony—including the data underlying the expert's theories and the methodology by which the expert draws conclusions from that data—is reliable." *Gilbert v DaimlerChrysler Corp*, 470 Mich 749, 779; 685 NW2d 391 (2004).

In its gatekeeping capacity, the trial court must make "a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." *Daubert*, 509 US at 592-593. This analysis does not hinge on discovering "absolute truth" or resolving "genuine scientific disputes." *Chapin v A & L Parts, Inc*, 274 Mich App 122, 127; 732 NW2d 578 (2007). Even the *Daubert* court recognized the unreasonableness of expecting that an expert's testimony "must be 'known' to a certainty; arguably, there are no certainties in science." *Daubert*, 509 US at 590.

Trial courts have broad latitude to consider whether the expert's specialized knowledge or technique has been tested or subjected to peer review and publication, whether the known or potential rate of error has been determined, whether standards exist that control the technique's operation, and the degree of general acceptance in the relevant expert community, as well as, other relevant factors as part of its determination of the reliability of the expert's relevant testimony. *Id*. at 593-594; *Kumho Tire*, 526 US at 151-153. An expert may draw a conclusion from a set of observations based on extensive and specialized experience and knowledge. *Kumho Tire*, 526 US at 156. "[T]he trial court's role as gatekeeper does not require it to search for absolute truth, to admit only uncontested evidence, or to resolve genuine scientific disputes." *People v Unger*, 278 Mich App 210, 217; 749 NW2d 272 (2008) (citation omitted). "The inquiry is not into whether an expert's opinion is necessarily correct or universally accepted," but "whether the opinion is rationally derived from a sound foundation." *Id*. (citation omitted).

Defendant concedes that opinion testimony regarding whether a suspect was impaired would likely assist the trier of fact to determine a fact in issue at trial. She also concedes that Deputy Schaller completed the requisite training and education to be proficient in the DRE protocol. Defendant, however, takes issue with using the DRE analysis because the presence of a drug in a subject's blood does not necessarily equate to impairment, and she contends that use of the DRE protocol cannot establish the degree of driving impairment with "scientific certainty."

The record indicates that neither the prosecution nor Deputy Schaller represented to the lower courts that use of the DRE protocol, in and of itself, definitively establishes a person's degree of impairment. Nor did Deputy Schaller testify that the DRE protocol's use led to absolute certainty regarding a person's drug impairment. Rather, the record indicates that the DRE protocol serves as one of several tools law enforcement uses to determine if probable cause exists to charge a suspect of violation of MCL 257.625(1).

Evidence presented to the lower courts revealed that the DRE program is a nationally standardized protocol used by specially trained and certified law enforcement officers for identification of intoxication of persons by controlled substances within seven categories of drugs. Officers are trained to follow the 12-step protocol to observe behavioral and physiological indicators to determine the drug that the suspect may have used and assess the degree of impairment based on the totality of the officer's relevant observations. The record does not reflect that any dispute exists regarding the indicators of marijuana intoxication which can include

observable physical evidence such as bloodshot eyes, eyelid tremors, pupil size, body tremors, body balance issues, and behavioral indicators such as inattention, inability to follow directions, inability to perform multiple tasks, and altered space and time perception. The record also indicates that NHTSA studies and data collected over many years confirm that the use of the DRE protocol methodology enables highly accurate conclusions regarding drug intoxication.

Defendant relies on some statements made in NHTSA's 2017 Report to Congress to argue that, because no tests have established the specific level of THC in a person's blood that affects a person's ability to safely operate a motor vehicle, the DRE testing protocol completely lacks reliability, requiring exclusion of Deputy Schaller's testimony. The 2017 NHTSA Report indicates that, unlike alcohol, there is no chemical test for marijuana impairment that correlates the level of THC in the blood with the degree of impairment. Consequently, THC blood test levels cannot serve as an indicator of driver impairment.[4] Nevertheless, the Report acknowledges that smoking marijuana has been shown in many studies to affect a number of driving-related skills such as reaction time, tracking ability, lane position variability, decreased divided attention-target recognition, impaired cognitive performance like judgment, attention maintenance, impaired executive functioning, as well as impairment on psychomotor tasks.[5] Although the Report recognizes limitations of the DRE testing protocol because no chemical based impairment standard exists, and that it cannot serve alone as an impairment determiner, the Report, nevertheless, acknowledges that the DRE program serves as an aid in law enforcement investigations of suspected drug-impaired driving cases where properly trained officers follow good investigatory techniques and carefully document their factual observations.[6] The Report does not assert anywhere that law enforcement should not use DRE trained and certified officers as part of drug-impaired driving case investigation. Rather, it endorses the DRE program as the highest level of training an officer can receive to "identify the signs and symptoms of drug use that could be used to determine whether a suspected driver was impaired by drugs and to rule out possible causes such as neurological deficits, diseases, and illness."[7] The Report is not dispositive on whether the district court erred by qualifying Deputy Schaller as an expert or the circuit court's affirmance of that decision. I find defendant's arguments go to the weight of Deputy Schaller's testimony but not its admissibility.

As explained in *Kumho Tire*, an "expert might draw a conclusion from a set of observations based on extensive and specialized experience." *Kumho Tire*, 526 US at 156. Examination of the record in this case reveals that Deputy Schaller had numerous years' experience as a sheriff's deputy serving on road patrol during which he investigated and apprehended suspected drug-

---

[4] *Marijuana-Impaired Driving-A Report to Congress*, at 7, 11, 13, 27-29.

[5] *Id*. at 11, 13, 22.

[6] *Id*. at 9, 27-28. The Report states:

> The lack of an "impairment standard" equivalent to BAC level does not prevent the successful prosecution of a marijuana-impaired driver. The lack of toxicological evidence simply means that the officer has to offer other evidence that the driver was under the influence of marijuana too impaired to drive safely. [*Id*. at 28.]

[7] *Id*. at 28.

impaired drivers. He had training and experience in administering SFSTs, was ARIDE certified, and trained and certified in the DRE program, and had administered the DRE testing protocol in the field numerous times. His conclusions regarding driver drug usage and impairment were confirmed in a very high percentage of the cases. The record confirms the district court's and circuit court's conclusions that Deputy Schaller had the requisite training, specialized knowledge, and experience to identify behavioral and physiological signs of impairment caused by different classes of drugs, plus 17 years' experience as a road patrol deputy interacting with intoxicated drivers.

Respecting the sufficiency of the facts and data on which Deputy Schaller relied, he testified regarding the manner in which he conducted his investigation in this case which included attending the scene and observing defendant's traffic stop, observing her bloodshot eyes, smelling the odor of marijuana on her person and in her car, observing her deficient performance of the SFSTs administered by Deputy White, observing her deficient performance of the tests administered by Deputy Williams, and observing defendant and collecting data during his administering of the DRE protocol. Deputy Schaller followed the applicable steps in the DRE protocol and documented his findings. Deputy Schaller also considered defendant's admissions to the investigating officers that she smoked marijuana 30 minutes before the traffic stop and admitted to the officers in Deputy Schaller's presence that she felt impaired at level 3 on a scale of 1-10. Deputy Schaller considered all of these facts and data obtained during the investigation and concluded that defendant had operated her motor vehicle while under the influence of marijuana and had been impaired to the extent that she could not safely operate her vehicle. Defendant has failed to establish that the facts and data obtained during the investigation by Deputy Schaller lacked accuracy or sufficiency for an experienced law enforcement officer to form an opinion. She does not challenge the deficiencies of her performance of the various tests. Nor does she dispute Deputy Schaller's testimony that he based his opinions upon the totality of the circumstances, not merely the application of the DRE protocol. The record indicates that Deputy Schaller derived his conclusions by applying standardized principles and valid investigative methods to the facts of this case.

I conclude that the district court did not abuse its discretion by finding that sufficient facts and data supported the validity of the DRE protocol and Deputy Schaller's testimony regarding defendant's marijuana intoxication based upon the totality of the circumstances. Likewise, the circuit court correctly concluded that Deputy Schaller formed his opinions based on reliable principles and methods and properly concluded that his testimony would assist the trier of fact in understanding the effects of marijuana intoxication and in determining a fact in issue. The circuit court also correctly understood that the degree of defendant's intoxication remained a question for the trier of fact to decide in relation to its determination whether the prosecution proved all of the elements of the charged offense.

The record supports the district court's and the circuit court's conclusions that Deputy Schaller's testimony is based on sufficient facts and data collected during the investigation, that his testimony is the product of reliable investigatory principles and methods, and that he applied those principles and methods to the fact of this case. The record also supports the courts' respective conclusions that Deputy Schaller's testimony will assist the trier of fact to understand a fact in issue. I conclude that Deputy Schaller's testimony meets the requirements of MRE 702 and applicable law and is admissible. Moreover, to the extent that any concerns exist regarding how

the jury should understand his testimony, Deputy Schaller would be subjected to cross-examination and the trial court can ably instruct the jury regarding its consideration of his testimony.

Accordingly, in my opinion, the district court did not abuse its discretion by qualifying Deputy Schaller as an expert to testify regarding whether defendant operated her motor vehicle while under the influence of marijuana and impaired to a degree that made her unable to safely operate her motor vehicle. The circuit court did not err by affirming the district court's decision. Accordingly, I would affirm.

/s/ James Robert Redford