*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

Plaintiff-Appellee,

v

PAUL CLIFTON MCCOLOR,

Defendant-Appellant.

UNPUBLISHED
November 14, 2024
1:52 PM

No. 367968
Wayne Circuit Court
LC No. 22-002965-01-FC

Before: BORRELLO, P.J., and N. P. HOOD and YOUNG, JJ.

PER CURIAM.

Defendant, Paul Clifton McColor, appeals by right his jury trial convictions for first-degree felony murder (felony murder), MCL 750.316, being a felon in possession of a firearm (felon-in-possession), MCL 750.224f, and two counts of carrying a firearm during the commission of a felony, second offense (felony-firearm, second offense), MCL 750.227b.[1] The trial court sentenced McColor to life imprisonment without the possibility of parole for the felony-murder conviction, 22 months to 5 years' imprisonment for the felon-in-possession conviction, and five years' imprisonment for each of the felony-firearm, second offense convictions. On appeal, he argues that he was denied effective assistance of counsel because, when he chose to testify in his own defense, his trial counsel barely asked him any questions. Assuming without deciding that this conduct fell below the objectively reasonable standard for presenting a defense, we nonetheless conclude that McColor has not established that the conduct prejudiced him. We therefore affirm.

## I. BACKGROUND

This case arises out of the murder of Saad Halabo on March 18, 2022, in a check cashing business in Highland Park, Michigan, where Halabo worked. Yousif Saka testified that he had

---

[1] McColor was also charged with larceny, $1,000 or more, but less than $20,000, MCL 750.356(3)(a). McColor was found not guilty of the larceny charge. One felony-firearm charge is associated with the felony-murder charge, and the other is associated with the larceny charge.

worked at the Check Cashing Mart (the mart) for about three years and was working there the day of the shooting. Customers would bring checks to the mart to cash them when they did not want to wait for a bank hold or did not want the money to be garnished from their account. Halabo and Saka kept track of customers that had previously cashed checks. According to Saka, Halabo always kept between $50,000 and $100,000 in currency at the mart to run the business.

Saka knew McColor because several months earlier, he came to cash a large check. In November 2021, he cashed a check for $52,168. Saka and Halabo held McColor's money for two weeks because he was a new customer.[2] He collected his money in increments over several visits during the month following the hold to make sure the check cleared.

On March 18, 2022, Saka opened the mart at 9:00 a.m. Halabo arrived at around 1:00 p.m. McColor came to the mart twice that day and called multiple times in the morning. McColor first came to the mart at around 1:00 p.m., and Saka gave him money to put gas in his car so he could pick up a check. He then came back to the mart at around 4:00 p.m. Saka testified that he was wearing a face mask, but was still identifiable. Saka recognized McColor from his voice and body, and Saka could see about 2/3 of McColor's face, including his eyes and nose.

Saka let McColor into the back hallway of the mart to cash his check. McColor was on the phone and did not give Saka or Halabo the envelope he was holding. He then pointed a gun at Saka and Halabo and asked for all of the money in the mart. McColor then shot Halabo in the face and ran out of the mart.

The prosecution charged McColor related to the murder, possession of the firearm, and for larceny or attempted larceny on the theory that McColor tried to take Halabo's property.

At trial, in addition to Saka's testimony, the prosecution introduced physical evidence linking McColor to the crime. The prosecution also introduced surveillance footage that showed the shooter holding a plastic bag with what appeared to be a gasoline can inside of it, but the shooter left without the bag. Michigan State Police (MSP) Detective Sergeant Adam Diroff, the officer in charge, testified that police located a gasoline can in the back hallway of the mart and took swabs from it. Monica Barlyski, a forensic scientist at the MSP Forensic Laboratory, testified as an expert in the field of forensic science and forensic biology. She compared DNA from the swab of the gasoline can handle with a swab of McColor's mouth. She testified that according to the DNA analysis performed, the DNA profile obtained from the gasoline can was "sixty octillion times more likely" to originate from McColor than a random donor.

---

[2] Saka testified that the mart would cash checks of any denomination. The fees for cashing a check were typically 2% to 3%. For large denomination checks, however, Halabo and Saka would give all of the money to repeat customers they knew. If Halabo and Saka did not know the customer, they would hold a percentage of the money for two weeks to ensure that the check would clear. Halabo and Saka used a database to keep track of all the customers who cashed checks at the mart They also took a photograph of every customer cashing a check or a video of them speaking if they had cashed a large check in case the customer tried to claim that they did not cash the check.

Other MSP witnesses testified about a search warrant executed at McColor's home. There, MSP recovered a jacket that was similar to a description given by Saka of the jacket that the shooter was wearing.

During that search, MSP also seized McColor's cellphone. Witnesses testified about text communications on McColor's phone that indicated he was trying to sell a semiautomatic pistol for $500. In the messages, McColor referred to the pistol as a ".9 M," which Detective Sergeant Diroff testified likely meant a .9 millimeter pistol, the same caliber of pistol used in the shooting.

The prosecution also presented evidence that following his arrest, McColor sent letters from jail suggesting that he was preparing a false alibi. Sergeant Lacey Polderdyke, with the Internal Affairs unit of the Wayne County Sheriff's Office, testified that she investigated the "red flag" mail of inmates in the Wayne County Jail. This mail includes mail sent by an inmate trying to disguise their name or number, mail sent to a nickname rather than a legal name, or mail sent by an inmate who usually does not send mail. Sergeant Polderdyke testified that she would forward the relevant mail to a prosecutor if it implicated a case. While McColor was awaiting trial, Polderdyke received a letter with McColor's name on the return address. The letter was addressed to "Desi and Dirty" without identified last names. In the letter, McColor wrote, "give Kirkwood[3] his letter. Alibi makes it easier." There was a second letter in the envelope labeled "Kirkwood." That letter said, "[y]ou made a statement already so we gotta stay close to that one . . . That's all I need and I'm free. They can't prove that's me on camera, mask and hoody on."

During trial, McColor indicated that he wished to testify. On direct examination, defense counsel asked McColor if he was aware of the charges against him and if he was guilty. McColor said he was aware of the charges and was not guilty. Defense counsel asked no further questions and indicated that he refrained from doing so for strategic purposes. During cross-examination, McColor agreed that his DNA was on a gasoline can found at the scene and that he had written the letters flagged by Sergeant Polderdyke.

After cross-examination, McColor asked to speak with his attorney. He stated, "I got a lot to go over. [Defense counsel] need to ask me questions." The jury was excused from the courtroom. Defense counsel stated he had no further questions for McColor. Defense counsel said he understood that McColor wanted to be asked further questions, but he did not think it was wise "from a strategy standpoint." McColor was informed that defense counsel would not ask him more questions on the record. McColor said, "[y]ou should of [sic] shared that with me, [defense counsel] . . . you needed to talk with me about that." The trial court informed McColor that he could not testify further.

As described, McColor was convicted of felony murder, felon-in-possession, and associated counts of felony-firearm. He was acquitted of larceny and an associated felony-firearm count. This appeal followed.

---

[3] No full name was given for Kirkwood.

## II. STANDARD OF REVIEW

As stated in *People v Otto*, ___ Mich App ___, ___; ___ NW3d ___ (2023) (Docket No. 362161); slip op at 4:

> A claim of ineffective assistance of counsel involves a mixed question of law and fact. *People v Trakhtenberg*, 493 Mich 38, 47; 826 NW2d 136 (2012). We review findings of fact, if any, for clear error. *Id.* "We review de novo the constitutional question whether an attorney's ineffective assistance deprived a defendant of his or her Sixth Amendment right to counsel." *People v Fyda*, 288 Mich App 446, 449-450; 793 NW2d 712 (2010). "Where the trial court has not conducted an evidentiary hearing, this Court's review is limited to mistakes apparent on the record." *People v Hughes*, 339 Mich App 99, 105; 981 NW2d 182 (2021) (quotation marks and citation omitted). Issues of statutory interpretation are reviewed de novo. *People v Ambrose*, 317 Mich App 556, 560; 895 NW2d 198 (2016).

"Both the Michigan and United States Constitutions guarantee criminal defendants the right to be represented by counsel." *Otto*, ___ Mich App at ___; slip op at 4, citing Const 1963, art 1, § 20; US Const, Am VI. "The constitutional right to counsel is not merely the right to have a lawyer stand or sit nearby; rather, a criminal defendant has the right to the effective assistance of counsel." *Otto*, ___ Mich App at ___; slip op at 4.

A potential violation of the due process right to present a defense is an issue of constitutional law. *People v Smith*, ___ Mich App ___, ___; ___ NW3d ___ (2024) (Docket No. 362114); slip op at 8. An unpreserved constitutional error is reviewed for plain error that affects the defendant's substantial rights. *People v Solloway*, 316 Mich App 184, 197; 891 NW2d 255 (2016).

## III. INEFFECTIVE ASSISTANCE OF COUNSEL FOR LIMITING TESTIMONY

McColor argues that we should vacate his convictions because he was deprived of his right to effective assistance of counsel and his right to present a defense. We disagree. Even assuming that McColor has established that defense counsel's performance was deficient, he has not established that he was prejudiced by the specific conduct with which he takes issue.

An ineffective-assistance-of-counsel claim has two parts: (1) deficiency and (2) prejudice. *Fyda*, 288 Mich App at 450. See also *Strickland v Washington*, 466 US 668, 687; 104 S Ct 2052; 80 L Ed 2d 674 (1984). "To establish a claim of ineffective assistance of counsel a defendant must show that counsel's performance was deficient and that counsel's deficient performance prejudiced the defense." *Fyda*, 288 Mich App at 450. Regarding the first prong, deficiency, "[t]rial counsel's performance is deficient when it falls below an objective standard of professional reasonableness." *Hughes*, 339 Mich App at 105. "When reviewing defense counsel's performance, the reviewing court must first objectively determine whether, in light of all the circumstances, the identified acts or omissions were outside of the wide range of professionally competent assistance." *Id.* at 105-106 (quotation marks and citation omitted). The second prong, prejudice, requires a defendant to "show that there is a reasonable probability that, but for counsel's

unprofessional errors, the result of the proceeding would have been different." *People v Leffew*, 508 Mich 625, 637; 975 NW2d 896 (2022) (quotation marks and citation omitted). "Reasonable probability means a probability sufficient to undermine confidence in the outcome." *Id.* at 637 (quotation marks and citation omitted).

## A. ASSUMING DEFICIENCY

We assume without deciding that trial counsel's performance was deficient. At the outset, we acknowledge that decisions about calling and questioning witnesses are presumably matters of trial strategy. *People v Putman*, 309 Mich App 240, 248; 870 NW2d 593 (2015). Counsel must have wide latitude to make decisions. *Strickland*, 466 US at 689. There is a strong presumption that counsel's actions are sound trial strategy. *People v Ackley*, 497 Mich App 381, 388; 870 NW2d 858 (2015). "This Court does not second-guess counsel on matters of trial strategy." *People v Traver*, 328 Mich App 418, 422; 937 NW2d 398 (2019). Strategic decisions are reviewed from the perspective of counsel at trial, not with hindsight. *Strickland*, 466 US at 689.

But, criminal defendants have the right to testify in their defense. *People v Spaulding*, 332 Mich App 638, 656; 957 NW2d 843 (2020). "A defendant's right to testify in his own defense stems from the Fifth, Sixth, and Fourteenth amendments of the United States Constitution." *People v Boyd*, 470 Mich 363, 373; 682 NW2d 459 (2004). Therefore, it implicates not only the right to counsel, but also the right to due process, which is to say, the right to have one's day in court. See *Rock v Arkansas*, 483 US 44, 51; 107 S Ct 2704; 97 L Ed 2d 38 (1987). Put plainly, if a defendant wishes to testify at trial, the trial court must allow it over counsel's objections. *Spaulding*, 332 Mich App at 656.

McColor argues that he was deprived of effective assistance of counsel when his trial counsel did not allow him to testify to the extent he wished. During direct examination, defense counsel asked McColor if he understood what he was accused of and if he committed any of the crimes he was accused of. McColor argues that he wanted to testify about more matters but could not because of defense counsel's limited questioning. McColor indicated that he wanted to explain why his DNA was on a gasoline can at the scene of the crime.[4] But he has not made any offer of proof that allege facts in support of why his DNA was on the gas can. See *People v Serges*, ___ Mich App ___, ___; ___ NW3d ___ (2024) (Docket No. 355554); slip op at 19.

We accept the possibility that there may have been valid reasons for defense counsel's limited questions. Given the incriminating DNA results, counsel may have made a strategic decision to avoid questioning McColor further on the DNA evidence to avoid drawing further attention to it or avoiding a credibility problem. If so, defense counsel's refusal to question McColor on this point would have been professionally reasonable. Cf. *People v Horn*, 279 Mich App 31, 40; 755 NW2d 212 (2008) (explaining that it may be professionally reasonable to withhold an objection to avoid drawing attention to a comment).

---

[4] Defense counsel's brief mentioned "other factual issues" that McColor wanted to testify about, but it is unclear from McColor's protests during trial what issues those would be.

Further, we observe that defense counsel's limited questioning could have been an imperfect attempt to comply with Rule 3.3 and 4.1 of the Michigan Rules of Professional Conduct. MRPC 3.3 and 4.1 prohibit counsel from knowingly eliciting false testimony. See MRPC 3.3(a); MRPC 4.1. See also *People v Toma*, 462 Mich 281, 303 n 16; 613 NW2d 694 (2000). "While a defendant may have the constitutional right to the effective assistance of counsel, this does not encompass the right to assistance of counsel in committing perjury." *Toma*, 462 Mich at 303 n 16. "In fact, an attorney's refusal to knowingly assist in the presentation of perjured testimony is not only consistent with his ethical obligations, but cannot be the basis of a claim of ineffective assistance of counsel." *Id*. Therefore, if counsel limited his questions to McColor as the only way that he could aid McColor in presenting his story within counsel's ethical obligations not to knowingly offer false evidence, then there would be no deficiency.

Under other circumstances, this issue might warrant an evidentiary hearing. But because we can resolve this case on the issue of prejudice, we decline to remand for that purpose. Instead, we assume without deciding that McColor has established counsel's deficiency.

## B. PREJUDICE

McColor's ineffective-assistance-of-counsel claim fails because he has not established that he was prejudiced. See *People v Randolph*, 502 Mich 1, 9; 917 NW2d 249 (2018). If there is relatively little evidence supporting a guilty verdict, then the magnitude of errors needed to find prejudice will be lower than when there is more evidence of guilt. *Trakhtenberg*, 493 Mich at 56. Here, there was substantial evidence of McColor's guilt. So much so, that the limited questions defense counsel asked, and the lack of the more expansive testimony McColor claims he intended to provide, did not prejudice him.

If defense counsel had questioned McColor further, there is not a reasonable probability that the result of the trial would be different. See *Randolph*, 502 Mich at 9. There were numerous forms of evidence (physical and testimonial, direct and circumstantial) that pointed toward McColor's guilt in this case. *Trakhtenberg*, 493 Mich at 56. First, there was direct evidence of his guilt: Saka testified that he was familiar with McColor, had spoken to him on the phone on the day of the shooting, and witnessed him shoot Halabo. There was also circumstantial evidence. For example, police located a jacket at McColor's residence that matched surveillance images and a description given by Saka. There was evidence that McColor was trying to sell a .9-millimeter pistol, and Halabo was shot with the same type of firearm. A gasoline can was left at the scene of the crime the same day the shooting occurred, and forensic analysis of the DNA on the handle indicated that it was much more likely to have come from McColor than a random donor. McColor also wrote a letter from jail to someone named Kirkwood[5] trying to establish an alibi and stated that he could not be identified on the surveillance camera. In short, much of the evidence at trial pointed to McColor's guilt.

Therefore, even if defense counsel questioned McColor about how his DNA got on the gasoline can found at the scene of the crime, there is not a reasonable probability that the result of

---

[5] No last name was given.

the trial would have been different. McColor has not pointed to other issues on which he might have testified, but it is difficult to imagine how further testimony would have changed the result. We therefore conclude that McColor has failed to meet his burden for his ineffective-assistance-of-counsel claim.

## IV. DUE PROCESS

In the alternative, McColor argues that his due process right to present a defense was violated by the trial court ruling that he was precluded from testifying further. McColor did not raise this issue in the trial court, and thus, it is unpreserved. *Solloway*, 316 Mich App at 197. We review unpreserved errors for plain error affecting substantial rights. *People v Carines*, 460 Mich 750, 763; 597 NW2d 130 (1999). As stated in *People v Brown*, ___ Mich App ___, ___; ___ NW3d ___ (2024) (Docket No. 359376) (N. P. HOOD, J., concurring); slip op at 3:

> To obtain relief under the plain-error rule, a defendant must prove that (1) an error occurred, (2) the error was plain, and (3) that the plain error affected substantial rights—in other words, the error affected the outcome of the proceedings. *People v Anderson*, 341 Mich App 272, 280; 989 NW2d 832 (2022). If a defendant satisfies these three requirements, we must determine whether the plain error warrants reversal, in other words, whether it seriously affected the fairness, integrity, or public reputation of the judicial proceedings independent of the defendant's innocence. *Carines*, 460 Mich at 763-764. Sometimes identified as a fourth prong of plain-error analysis, this last step conceptually overlaps with the third prong. [*People v Davis*, 509 Mich 52, 75-76; 983 NW2d 325 (2022).]

We will assume without deciding that McColor has satisfied the first to prongs, i.e., an error occurred and that it was plain, which is to say obvious. Criminal defendants must have a meaningful opportunity to present evidence in their defense. *People v Warner*, 339 Mich App 125, 144; 981 NW2d 733 (2021), rev'd on other grounds ___ Mich ___ (2024) (Docket No. 163805). While due process includes the right to present a defense, it is not an absolute right. *People v Kowalski*, 492 Mich 106, 139; 821 NW2d 14 (2012). The right to offer witness testimony is within the scope of the right to present a defense. *Warner*, 339 Mich App at 145. Criminal defendants must comply with established procedural and evidentiary rules that are meant to assure fairness and reliability. *People v King*, 297 Mich App 465, 474; 824 NW2d 258 (2012). Therefore, the right to present a defense only applies to admissible and relevant evidence. *Solloway*, 316 Mich App at 198. For a reversal on the grounds of the right to present a defense, the prejudicial plain error must have resulted in the conviction of an innocent defendant or greatly affected the fairness or integrity of the proceeding. *Id*. at 197.

Here, we assume McColor's due process right to present a defense was violated when the trial court prevented him from testifying further. A defendant does not have an unlimited right to present a defense. *Kowalski*, 492 Mich at 139. McColor's desire to testify was within the scope of his right to present a defense. *Warner*, 339 Mich App at 145. He wanted to testify about how his DNA got on the gasoline can at the scene of the crime. This evidence would likely be relevant and admissible. *Solloway*, 316 Mich App at 198. We assume without deciding that counsel's questioning prevented him from offering this alternate theory of how his DNA got on the gasoline can, and that this implicated his right to present a defense.

As described in Part III, however, McColor has not established that this purported error prejudiced him. Here, there was multifaceted, high-confidence evidence of McColor's guilt. This included the DNA evidence on the gas can. But it also included direct eyewitness testimony implicating McColor as the shooter and other circumstantial evidence. Defense counsel's decision to prevent McColor from further testifying, therefore, was not a prejudicial plain error that resulted in the conviction of an innocent defendant or greatly impacted the fairness or integrity of the proceeding. See *Solloway*, 316 Mich App at 197.

## V. CONCLUSION

For the reasons stated, we conclude that McColor has not established ineffective assistance of counsel or plain error related to the claimed due process violations. We therefore affirm.

/s/ Stephen L. Borrello
/s/ Noah P. Hood
/s/ Adrienne N. Young